Filed 11/19/13  In re B.C. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re B.C., a Person Coming Under the Juvenile Court Law. | H040170<br>(MontereyCounty<br>Super. Ct. No. J47237) |
| B.C.,<br><br>        Petitioner,<br><br>        v.<br><br>MONTEREY COUNTY SUPERIOR COURT,<br><br>        Respondent,<br><br>MONTEREY COUNTY DEPARTMENT OF SOCIAL & EMPLOYMENT SERVICES,<br><br>        Real Party in Interest. | |

## I.        INTRODUCTION

B.C. (the minor) is the child at issue in this juvenile dependency case.  She has filed a petition for extraordinary writ seeking review of the juvenile court's orders terminating reunification services for her mother, E.C. (Mother), and setting a Welfare

and Institutions Code section 366.26[1] permanency planning hearing. (See Cal. Rules of Court, rule 5.695(h)(15).[2])

In her petition, the minor claims: (1) the juvenile court failed to make the statutorily required findings to support denial of reunification services, and the disposition report failed to provide sufficient information upon which the court could make appropriate findings; (2) negligence cannot support the denial of reunification services based upon infliction of severe sexual abuse pursuant to section 361.5, subdivision (b)(6); and (3) the juvenile court failed to make a finding that denial of reunification services would be in the minor's best interest.

Mother has filed a letter indicating she joins in the minor's challenge to the juvenile court's orders. For the reasons stated below, we will deny the petition for writ of mandate.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Section 300 Petition*

On May 28, 2013, the Monterey County Department of Social Services (the Department) filed a petition alleging that the minor, who was 11 years old, came within the jurisdiction of the juvenile court pursuant to section 300, subdivisions (b) [failure to protect], (d) [sexual abuse], and (g) [no provision for support]. The petition alleged the following:

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[2] All further rule references are to the California Rules of Court unless otherwise indicated.

2

The minor's alleged father was M.S. (Father), who was in state prison.[3]  Mother had two younger children, both of whom lived with their fathers and did not need the court's protection.

On May 14, 2013, the minor disclosed that her step-grandfather, D.S., had been sexually abusing her since she was seven years old.  The minor had been forced to perform oral copulation and digital anal penetration; D.S. had also performed those acts on the minor.  Additionally, D.S. had rubbed his penis on the minor's vagina, manually rubbed her vagina, and forced the minor to masturbate his penis.  The sexual abuse took place in locked rooms in the family home.  A forensic medical examination was consistent with the minor's reported history of sexual abuse.

D.S., who was arrested, "had been the subject of a nation-wide manhunt due to internet child pornography."  In the family home, D.S. had set up "computer and video equipment to record the sexual abuse acts."

Mother admitted "she suspected" that D.S. was abusing the minor, although the minor had denied that "anything was happening" when Mother asked.  Mother knew that D.S. had been locking the minor in rooms.  She knew that the home was "covered by surveillance cameras."  At some point, she told D.S. not to lock the doors any more, but she continued to allow the minor to be alone with D.S. and to sleep in a bed with D.S. and G.S. (Grandmother).

Following the police intervention, Grandmother "refused to believe the allegations and was attempting to get [the minor] to recant."  Grandmother "showed no empathy or concern of the abuse to [the minor] by her husband."  When shown a video of the minor orally copulating D.S., Grandmother said, " 'Well, if that's all he wanted he could have asked me.' "

---

[3] Father's current prison term stemmed from his convictions for possessing a firearm and "street gang acts."  He had prior convictions for assault, defrauding an innkeeper, use of a controlled substance, and robbery.

Mother had initially "refused to move," despite being instructed to leave the house due to Grandmother's attempts to have the minor recant. However, after three days she agreed to allow the minor to temporarily live with her paternal grandparents, R.P. and L.P.

In addition to the sexual abuse, the minor had "an ongoing problem with severe encopresis." The minor was "defecating in her pants almost daily." Mother claimed to have taken the minor to the hospital some time during the prior two to three years. Mother had received medication for the minor, but she stopped administering it because it made the problem worse. Mother had "allowed" D.S. and Grandmother to take the minor for a follow-up appointment, and at some point, Mother had signed a notarized form giving D.S. and Grandmother custody of the minor. Mother herself had never attended any follow-up appointments, and she did not know the name of the doctor that the minor had seen.

The Department had received a prior referral in 2001, about nine months before the minor was born. At that time, Mother was 17 years old. Police had found Mother, who was involved with the Youth Diversion Program, violating curfew with Father. Mother told the police "she did not like to be at home because her stepfather, [D.S.], sexually and physically abuses her." Mother stated that she had reported D.S.'s abuse to Grandmother, but that Grandmother did not believe her and told her not to talk to the social worker. "The referral was evaluated out." A December 2012 prior referral, "for neglect of [the minor]" by Mother, was also "evaluated out."

### B.    Detention Hearing

At the May 29, 2013 detention hearing, attorneys were appointed for Mother, Father, and the minor. The juvenile court ordered the minor detained and committed to the temporary care and custody of the Department.

4

## C.     Police Reports

Police reports were filed with the juvenile court on July 1, 2013. The reports summarized interviews with the minor, Mother, and Grandmother and provided further details of the sexual abuse and medical issues.

An investigation into D.S.'s criminal activity had been initiated when United States Immigration and Customs Enforcement (ICE) discovered that certain child pornography videos in Denmark had been produced in North America. The Department of Homeland Security circulated a news release requesting the public's assistance in identifying D.S., who was seen in the videos.

Mother recognized D.S.'s picture on the "Missing and Exploited Children" page of Facebook, then contacted the ICE tip line. Mother denied having "[any] idea that her daughter could be the victim" when she saw D.S.'s picture online. She "had not noticed any suspicious behavior or anything she considered to be a red flag."

A search warrant was served on the family residence on May 15, 2013.[4] Investigators discovered that D.S. had converted half of the garage into a windowless, soundproofed room that could be locked from inside. There was a camera outside the garage room, facing the doorway. The garage was attached to the house through a hallway. The door to the hallway was wired so that a bell would ring if someone opened the door into the hallway.

Mother referred to the garage room as a " 'music room.' " She knew that D.S. had soundproofed the room and installed the cameras, but claimed she believed the cameras were for security. She acknowledged that D.S. was in the garage room "for most of his waking hours." Mother further acknowledged that besides D.S., the minor was the only person who spent any significant time in the garage room. No one else was allowed to go

---

[4] The next day, a complaint was filed in federal court, charging D.S. with knowingly receiving or distributing child pornography through the mail or through interstate or foreign commerce. (18 U.S.C. § 2252, subd. (a)(2).)

into the room. Mother claimed that the minor had "never been locked inside the [garage] room with [D.S.]." She also claimed that "to her knowledge, the [minor] hadn't been in the room alone with [D.S.] for the past several months."

However, Mother acknowledged that about a year and a half earlier, Mother's live-in boyfriend had told D.S. "that if he ever locked the door to his room again with the victim inside, he would beat his ass." Mother claimed she had not been "uneasy" about the locked door because she never thought D.S. "would do anything like that."

After initially denying that she had any suspicions about D.S. sexually abusing the minor, Mother admitted that "she thought in the back of her mind that something was not right." Mother "suspected [D.S.] was touching [the minor] in ways he shouldn't have been." Mother asked the minor whether D.S. ever touched her, but the minor said that D.S. had not done so. Even when Mother said that nothing would happen to the minor or D.S., the minor "still said nothing happened."

Despite having suspicions that D.S. was sexually abusing the minor, Mother moved out of the residence for several months but allowed the minor to stay with D.S. and Grandmother.

Following the minor's forensic interview, Mother was instructed not to leave the victim alone with Grandmother, to ensure that Grandmother did not question or harass the minor about the allegations. Mother and her boyfriend had agreed to get a hotel room for the night. However, Mother allowed the minor to sleep with Grandmother instead. Grandmother admitted questioning the minor about the case that night.

Police obtained the minor's medical records, which showed that Mother brought her in to see a doctor in October of 2011 due to her constipation and incontinence. Mother had also attended the one-week follow-up appointment, along with D.S. and Father. The minor was referred to a gastroenterologist, but she never went. According to Mother, Grandmother refused to take the minor to the specialist because of the cost.

6

When asked if D.S. had ever done anything sexual to her, Mother said he had not. She also denied having made any such allegations about D.S. in the past. However, this conflicted with the 2001 report regarding Mother's allegations of being sexually abused by D.S. At that time, a police officer had contacted Mother regarding a curfew violation. Mother had told the officer that D.S. had "physically and sexually abused her and that he touched her in inappropriate places." Mother stated that she had to lock her bedroom door to make sure D.S. did not come in. Mother said she had told Grandmother about the sexual abuse, but Grandmother did not believe her.

When questioned about the 2001 report, Mother said she did not remember making those statements. Mother did say that D.S. "use[d] to beat her and that she fought back," and she suggested D.S. might have touched her in inappropriate places during their scuffles.

In speaking with the police and social worker, Grandmother called Mother "a big liar" who had lied about D.S. in the past. Grandmother asked if Mother had been "making false allegations against [D.S.], again." Grandmother did not understand why the minor could not live with her. Grandmother "failed to exhibit empathy or concern about [the minor]," and instead emphasized how the events "were negatively impacting her personally." She "continue[d] to support [D.S.] and visit[ed] him regularly in prison."

### D.    *Family Mental Health Assessment*

A Family Mental Health Assessment was filed with the juvenile court on July 1, 2013.

Mother had been interviewed on June 13, 2013. She "presented as stoic[ and] detached," and she gave evasive and conflicting responses. "Overall, [Mother] minimized the impact of the sexual abuse upon [the minor], and failed to take responsibility for her part in the dependency case."

Mother both denied making prior allegations about D.S. and claimed that she made up those allegations. She also admitted having "strong suspicions" that D.S. was abusing the minor while claiming she did not know that the minor was one of D.S.'s victims.

During her interview, Mother "seemed to be more focused on her own 'therapy,' rather than what [the minor] and the family require for healing in the wake of the sexual abuse." Mother perceived moving to a new home as the solution and did not identify any other treatment needs for the minor.

During supervised visitations with the minor, Mother was critical of the minor and did not realize how her criticisms distressed the minor. Mother appeared to relate to the minor "as more of a peer, rather than her own child." Mother "took on a passive role during the visitations, and the majority of the social interactions were initiated by [the minor]." The minor asked Mother to hug her and call her, and she "desperately sought validation and reassurance" from Mother, but Mother did not seem to notice.

The minor had been interviewed on June 6 and 7, 2013. During the interviews, she "sought physical proximity with th[e] examainer almost immediately, and required constant approval and reassurance." She demonstrated distress and anxiety during the interview. She described the sexual abuse, reporting that D.S. had forced her to perform sex acts with two other minors, that D.S. had anally penetrated her, that D.S. had forced her to touch and orally copulate his penis, and that D.S. had threatened her in order to ensure that she did not disclose the abuse.

The minor believed that Mother suspected the sexual abuse, saying, " 'Mom suspected . . . because she knew. [D.S.] was always asking me to go into that room . . . His garage room. . . . Mom would ask, "what did your granddad do?" . . . she did know.' "

The minor "described her relationship with [Mother] as 'nice . . . She cares for me . . . Tells me I love you so much. I love you with all my heart . . . Nothing good about

8

being separated from Mom.' " "When asked about three wishes that she could have granted," the minor's first request was to " '[s]ee my Mom everyday. . . .' " Her responses "reflect[ed] a strong connection to her mother . . . ."

The minor's caregiver (her paternal grandmother, L.P.) reported that the minor was "adjusting well to her new home environment." The caregiver noted that the minor was the one who generally initiated contact with Mother. The caregiver believed that Mother sometimes brought up "inappropriate and potentially re-traumatizing" subjects during phone calls. The caregiver observed that visits with Mother were " 'hard' " for the minor.

According to the social worker, it was "essential that [Mother] accept responsibility for her role in the current dependency case and learn how the history of chronic sexual abuse impacted [the minor]" if reunification was to occur. The social worker recommended that Mother participate in mental health treatment and complete a parenting class. The social worker further recommended that the minor participate in mental health treatment as well as family therapy with her current caregiver.

### E.      *Jurisdiction/Disposition Report*

The Department's jurisdiction/disposition report was filed on July 5, 2013. The Department recommended that the juvenile court deny reunification services (but permit visitation) and set the matter for a selection and implementation hearing.

The Department indicated its recommendation to deny reunification was based on section 361.5, subdivision (b)(6) and acknowledged "that such a proposal must be in the child's best interest." Specifically, "The Department recommends that family reunification services be denied to the mother, because she should have known that her child was being abused . . . ." "The Department's assessment is that the child appears bonded to her mother, but it is an unhealthy bond, due to the inadequacy of the mother's parenting. The mother has taken no responsibility for what has happened to her daughter . . . . It is likely that providing up to 18 months of family reunification services would

9

hinder the child's ability to heal and move forward with permanency with a safe and capable caregiver. Due to the nature, severity and longevity of the mother's deficits, it appears unlikely that she would be able to overcome the obstacles in front of her within 18 months, if ever."

### F.    Jurisdiction Hearing

A jurisdiction hearing was held on July 10, 2013. Mother did not contest jurisdiction, and the minor submitted "on the issue of jurisdiction and disposition." The juvenile court adopted the findings and orders of the jurisdiction report.

### G.    Trial Briefs and Caregiver Letter

The Department filed a trial brief on September 9, 2013. In its brief, the Department framed the issue for disposition as "whether the Mother consented, actually or implicitly, to the sexual abuse." The Department indicated that it was "not arguing that the mother gave actual consent to the severe sexual abuse," but it asserted that there was "ample evidence that the Mother gave implicit consent to the severe sexual abuse." The Department made seven claims in support of such a finding: (1) Mother was herself sexually abused by D.S. and thus "was accepting the risk that he would molest" the minor when she allowed the minor to spend time alone with him; (2) Mother allowed the minor to spend time alone with D.S. despite having suspicions that D.S. was molesting the minor; (3) Mother prepared a notarized letter giving custody to D.S. and Grandmother despite having been sexually abused by D.S. herself and despite her suspicions about D.S. molesting the minor; (4) Mother permitted the minor to sleep in the same bed as D.S. and Grandmother; (5) Mother allowed the minor to spend time with D.S. in a locked, soundproofed room; (6) the set-up of the garage room was "a dead giveaway" that sexual abuse was occurring; (7) the minor knew that Mother was aware of the molestation, since Mother would ask her what happened in the garage room.

The Department's brief also addressed the question whether reunification services would benefit the minor. The Department reiterated that Mother "knew or reasonably

10

should have known that [the minor] was being sexually abused by [D.S.]." The Department asserted that it would "take decades, if not a lifetime, of therapy to help [the minor] cope with the severe trauma she has suffered." The Department argued it was highly unlikely that Mother would be able to reunify within 12 months, due to her own history of abuse, her denial of that history, her inability to understand the severe trauma suffered by the minor, and her failure to take responsibility for her role in the situation.

The Department acknowledged that the minor might want to be reunified with Mother, but noted that the minor's wishes were "not determinative." The Department noted that it was "disconcerting" that Mother wanted to return the minor to the family home, where the abuse had occurred.

Mother filed a trial brief on September 10, 2013, urging the juvenile court to offer her reunification services. Mother claimed that D.S. had never abused her: "She made up the information because she knew that she was in big trouble with her mother and stepfather due to the fact that she had been staying out late and had not been behaving as they wished she would."

In her brief, Mother asserted that the notarized letter giving custody to D.S. and Grandmother was dated in 2008, which preceded the time of the sexual abuse. Mother further asserted, "[T]he grandparents had medical insurance . . . and [the minor] needed this in order for her to see the doctor."

Finally, Mother noted in her brief, "[The minor] wants to reunify with her mother and hopes that her mother will be offered services so that this will be possible."

The minor's caregiver submitted a letter to the court on September 13, 2013. The caregiver described how she and the minor "spent the first three weeks together in the bathroom" due to the minor's encopresis. The minor had been "living daily in soiled clothing and underclothes for years, her body was bleeding and sore from front to back[,] and she had absolutely no bowel control." "Just getting her body healthy took weeks and weeks, several trips to the doctor and eventually she has healed . . . ."

11

The caregiver described how she screened the minor's telephone conversations with Mother. She could see and hear "the [minor's] pain and confusion . . . as she listens over and over to her mother say how she is spending her time at amusement parks or fairs or the boardwalk, or daily motorcycles rides to Hollister hills or taking her younger brother to the show." The caregiver had "[n]ever once" heard Mother "acknowledge any responsibility for the fact that [the minor's] life as she had known it had been ripped apart . . . . Not once has [Mother] told her daughter that she was sorry.[]"

The caregiver explained that she had repeatedly attempted to get Mother to understand how the phone conversations were upsetting the minor. The caregiver believed that the conversations were "more harmful than good at this point." The caregiver was fearful that Mother's "lack of right judgment" would put the minor in danger again.

### H. Disposition Hearing

At the September 16, 2013 disposition hearing, Mother objected to the Department's recommendations and noted that she wanted to reunify with the minor. The minor submitted the matter on the jurisdiction/disposition report.

The parties entered into four stipulations: (1) Mother called ICE on May 14, 2013, met with ICE on May 15, 2013, and moved out of the family home with the minor on May 17, 2013; (2) the minor stated that she wanted to reunify with Mother; (3) Mother had signed the notarized letter giving custody to D.S. and Grandmother in order to have the minor covered by her parents' health insurance; and (4) Mother reported being sexually abused by D.S. when she was 17 years old, but there had been no follow-up or charges.

The juvenile court read its findings and order into the record as follows: "[The Court] sustains the petition pursuant to Section 300(b), (d), and (g), adjudges the child as a dependent of the Court, removes the child from the custody of the parents, finds that the current placement is appropriate, denies reunification services to the parent, and

12

schedules the matter for a Selection and Implementation hearing." The juvenile court also approved the case plan and ordered an assessment to be prepared by the Department. The court set the selection and implementation hearing (§ 366.26) for January 8, 2014.

## III. DISCUSSION

The minor and Mother contend the juvenile court erred by denying reunification services.

### A. Statutory Scheme

"[W]henever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare [i.e., reunification] services to the child and the child's mother and statutorily presumed father or guardians." (§ 361.5, subd. (a); see also rule 5.695(h)(1).) The foregoing subdivision sets forth the " 'general rule' " that " 'reunification services are offered to parents whose children are removed from their custody in an effort to eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible. [Citation.]' [Citations.]" (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112 (*Allison J.*).)

However, "subdivision (b) of section 361.5 sets forth a number of circumstances in which reunification services may be bypassed altogether. These bypass provisions represent the Legislature's recognition that it may be fruitless to provide reunification services under certain circumstances. [Citation.]" (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 597.) The bypass finding must be made "by clear and convincing evidence." (§ 361.5, subd. (b).)

One of the circumstances in which the juvenile court may bypass reunification services is if "the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse or the infliction of severe physical harm to the child, a sibling, or a half sibling by a parent or guardian, as defined in this

13

subdivision, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." (§ 361.5, subd. (b)(6); see also rule 5.695(h)(6)(F).)

"A finding of severe sexual abuse . . . may be based on, but is not limited to, sexual intercourse, or stimulation involving genital-genital, oral-genital, anal-genital, or oral-anal contact, whether between the parent or guardian and the child or a sibling or half sibling of the child, or between the child or a sibling or half sibling of the child and another person or animal *with the actual or implied consent of the parent or guardian*; or the penetration or manipulation of the child's, sibling's, or half sibling's genital organs or rectum by any animate or inanimate object for the sexual gratification of the parent or guardian, or for the sexual gratification of another person *with the actual or implied consent of the parent or guardian*." (§ 361.5, subd. (b)(6), italics added.)

"In determining whether reunification services will benefit the child pursuant to paragraph (6) . . . of subdivision (b), the court shall consider any information it deems relevant, including the following factors: [¶] (1) The specific act or omission comprising the severe sexual abuse or the severe physical harm inflicted on the child . . . . [¶] (2) The circumstances under which the abuse or harm was inflicted on the child . . . . [¶] (3) The severity of the emotional trauma suffered by the child . . . . [¶] (4) Any history of abuse of other children by the offending parent or guardian. [¶] (5) The likelihood that the child may be safely returned to the care of the offending parent or guardian within 12 months with no continuing supervision. [¶] (6) Whether or not the child desires to be reunified with the offending parent or guardian." (§ 361.5, subd. (i).)

The juvenile court must hold a dispositional hearing to consider whether to order reunification, and the social worker must prepare a report discussing "whether reunification services shall be provided." (§ 361.5, subd. (c).) The juvenile court "shall not order reunification for a parent or guardian described in [subdivision (b)(6)] unless

14

the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (*Ibid.*)

The juvenile court "shall read into the record the basis for a finding of severe sexual abuse or the infliction of severe physical harm under paragraph (6) of subdivision (b), and shall also specify the factual findings used to determine that the provision of reunification services to the offending parent or guardian would not benefit the child." (§ 361.5, subd. (k).)

### B. Standard of Review

" 'We affirm an order denying reunification services if the order is supported by substantial evidence. [Citation.]' [Citation.]" (*Amber K. v. Superior Court* (2006) 146 Cal.App.4th 553, 560 (*Amber K.*).)

### C. Statutorily Required Findings and Sufficiency of Disposition Report

The minor and Mother contend that the juvenile court failed to make the statutorily required findings to support denial of reunification services, and that the disposition report provided insufficient information upon which the court could make the required findings.

First, the minor and Mother complain that the juvenile court failed to find that Mother "consented, either actually or impliedly, to the severe sexual abuse of [the minor]." (See § 361.5, subd. (b)(6).) They further contend that "[e]ven if the juvenile court had made such a finding, there is nothing in the factual record to support it."

Although the juvenile court did not make an express finding that Mother actually or impliedly consented to the severe sexual abuse of the minor, the court impliedly made such a finding by sustaining the allegations of the petition. (Cf. *In re S.G.* (2003) 112 Cal.App.4th 1254, 1260 [appellate court may uphold denial of reunification services under section 361.5, subdivision (b)(6) in absence of explicit findings by juvenile court].) Further, substantial evidence supports the juvenile court's implied finding.

The instant case is similar to *Amber K., supra,* 146 Cal.App.4th 553, in which the appellate court found substantial evidence supported a finding that the mother had "by her actions, impliedly consented to the sexual abuse" of her daughter, S.M., by the father. (*Id.* at p. 561.) In that case, there was evidence that the father had previously sexually abused another child, D.L., and that D.L. had told the mother about the abuse "every time." (*Id.* at p. 560.) The sexual abuse of S.M. occurred when the mother allowed the father to stay at their house for a few nights. Because the mother allowed the father such access to S.M., knowing of his prior sexual abuse of another child, she "was an offending parent, within the meaning of section 361.5, subdivision (b)(6)" (*id.* at p. 561), that is, "a parent who gave actual or implied consent to the sexual abuse of the child by another person" (*ibid.*).

Here, there was substantial evidence to support a finding that Mother knew D.S. had previously sexually abused another child – Mother herself. Although there was conflicting evidence on the subject, the juvenile court impliedly agreed with the Department that Mother had in fact been sexually abused by D.S., as she had reported to the police in 2001. Despite her knowledge of D.S.'s prior sexual abuse of a child, and despite her own suspicions that D.S. was sexually abusing the minor (in addition to knowing that her boyfriend had the same suspicions), Mother permitted D.S. to have access to the minor in the locked garage room and in his own bed. Under the circumstances, the evidence supported a finding that Mother "was an offending parent within the meaning of section 361.5, subdivision (b)(6)" (*Amber K., supra,* 146 Cal.App.4th at p. 561), that is, "a parent who gave actual or implied consent to the sexual abuse of the child by another person" (*ibid.*). Substantial evidence supported a finding that Mother "by her actions, impliedly consented to the sexual abuse" of the minor by D.S. (*Ibid.*)

Second, the minor and Mother assert that the Department failed to prepare a report discussing "whether reunification services shall be provided." (§ 361.5, subd. (c).)

Specifically, they claim that the disposition report should have included a discussion about whether child welfare services could solve the issues in this case.

We disagree that the jurisdiction/disposition report failed to contain such a discussion. The report specifically discussed the reasons the Department was recommending denial of reunification services. The Department noted that Mother's parenting had been inadequate, that she had taken no responsibility for the minor's sexual abuse, and that "[d]ue to the nature, severity and longevity of the mother's deficits," it was unlikely that even 18 months of reunification services would benefit the minor. The Department specified that providing reunification services "would hinder the child's ability to heal and move forward with permanency with a safe and capable caregiver."

In sum, we find no merit to the claim that the juvenile court failed to make the statutorily required findings to support denial of reunification services, and we disagree that the disposition report provided insufficient information upon which the court could make the required findings.

### D. Denial of Reunification Services Pursuant to Section 361.5, Subdivision (b)(6) Based on Negligence

The minor and Mother next contend that negligence cannot support the denial of reunification services based upon infliction of severe sexual abuse pursuant to section 361.5, subdivision (b)(6). They contend that at most, Mother was merely negligent because she had no "direct knowledge of the abuse."

The minor and Mother rely on *Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839 (*Tyrone W.*), a case involving denial of reunification services under the "severe physical harm" provision of subdivision (b)(6).

In *Tyrone W.*, the court held that the juvenile court could not bypass reunification services under the "severe physical harm" provision of subdivision (b)(6) based on a finding that a parent " 'reasonably should have known' [the infant] was being physically abused." (*Tyrone W., supra,* 151 Cal.App.4th at p. 849.) The court noted that the

17

Legislature had included the words " 'deliberate' and 'inflicted' " in the "severe physical harm" provision of section 361.5, subdivision (b)(6), but not the phrase " 'reasonably should have known.' " (*Id.* at p. 850.) Considering this statutory language, the court held that "[t]he Legislature did not intend [section 361.5,] subdivision (b)(6) to apply to deny reunification services to a negligent parent; rather, the parent must have been complicit in the deliberate abuse of the child." (*Id.* at p. 843.)

This case does not involve an allegation under the "severe physical harm" provision of section 361.5, subdivision (b)(6). *Tyrone W.* does not address the question whether negligence can support the denial of reunification services based upon a finding of severe sexual abuse pursuant to section 361.5, subdivision (b)(6). Nevertheless, even assuming that a finding of negligence is insufficient, here there was substantial evidence to support a finding that Mother was not merely negligent, but that she impliedly consented to the sexual abuse. As explained above, under *Amber K., supra,* 146 Cal.App.4th 553, implied consent to sexual abuse may be found where a parent knows that another adult has previously sexually abused another child but nevertheless permits that adult to have access to another child. Here, Mother knew D.S. had previously sexually abused another child – Mother herself – and she had suspicions that D.S. was sexually abusing the minor, yet she permitted D.S. to have access to the minor in the locked garage room and in his own bed. This evidence is sufficient to establish that Mother impliedly consented to the sexual abuse as required under section 361.5, subdivision (b)(6). (See *Amber K., supra,* 146 Cal.App.4th at pp. 560-561.)

### E.    Best Interest Finding

Finally, the minor and Mother contend that the juvenile court erred by failing to make an explicit finding about whether denial of reunification services would be in the minor's best interest. They emphasize that the minor herself stated that she wanted to reunify with Mother, and they claim that the evidence established that they had "a loving and nurturing relationship." The minor and Mother contend that in light of "the strength

18

of the relationship between mother and child," reunification services were in the minor's best interest.

As noted above, section 361.5, subdivision (c) prohibits the juvenile court from ordering reunification "for a parent or guardian described in [subdivision (b)(6)] unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (*Ibid.*) "Section 361.5, subdivision (c) enables a parent to obtain reunification services notwithstanding section 361.5(b)[(6)] where the parent demonstrates reunification is in the child's best interest by offering evidence of, among other things, his or her current ability to parent." (*Allison J., supra,* 190 Cal.App.4th at p. 1116.)

"To determine whether reunification is in the child's best interest, the court considers the parent's current efforts, fitness, and history; the seriousness of the problem that led to the dependency; the strength of the parent-child and caretaker-child bonds; and the child's need for stability and continuity. [Citation.] A best interest finding requires a likelihood reunification services will succeed; in other words, 'some "reasonable basis to conclude" that reunification is possible. . . .' [Citation.]" (*Alison J., supra,* 190 Cal.App.4th at p. 1116.)

In *Amber K., supra,* 146 Cal.App.4th 553, the appellate court upheld the finding that reunification services were not in the child's best interest, despite the fact that one of the children clearly wanted to return to the mother's custody. The appellate court focused on the seriousness of the problem that led to the dependency: "Mother allowed father, a known sexual molester, to stay overnight at her home with the children." (*Id.* at p. 563.) Based on that fact, "the court clearly and properly found that offering mother reunification services would not be in the best interests of the children." (*Ibid*.)

Here, the same can be said about Mother: she allowed D.S., a known child molester, to stay overnight in bed with the minor and to stay in a locked garage room with the minor. Further, in this case, Mother had a history of very poor parenting –

specifically, her failure to adequately address the minor's longstanding encopresis. Additionally, the social worker's reports reflect that Mother failed to accept any responsibility for the sexual abuse, minimized the impact of the sexual abuse on the minor, and interacted with the minor inappropriately during visitations and telephone calls. On this record, "[t]here simply was not 'clear and convincing evidence' that reunification was in [the minor's] best interest, or any evidence that reunification was 'possible.' [Citation.]" (*Allison J., supra,* 190 Cal.App.4th at p. 1116.)

Lastly, the minor and Mother contend that the juvenile court erred by failing to make any "statement on the record" that reunification would not be in the minor's best interest. The juvenile court's failure to make an explicit finding about the minor's best interest does not preclude us from upholding its implied finding, however. (*In re S.G., supra,* 112 Cal.App.4th at pp. 1260-1261.) And, as stated above, in this case there was no clear and convincing evidence that reunification was in the best interest of the minor. (§ 361.5, subd. (c).)

## IV.    DISPOSITION

The petition for writ of mandate is denied.


_____
BAMATTRE-MANOUKIAN, ACTING P.J.




WE CONCUR:




_____
MÁRQUEZ, J.




_____
GROVER, J.

21