[No. H022860. Sixth Dist. Aug. 10, 2001.]

FRANCISCO G., Petitioner, v.
THE SUPERIOR COURT OF SANTA CRUZ COUNTY, Respondent;
HUMAN RESOURCES AGENCY OF SANTA CRUZ COUNTY, Real
Party in Interest.

**COUNSEL**

Wallraff & Gilman and Elisabeth A. Lord for Petitioner.

No appearance for Respondent.

Samuel Torres, Jr., County Counsel, and Shannon M. Sullivan, Assistant County Counsel, for Real Party in Interest.

## OPINION

**COTTLE, P. J.**—Francisco G., father of the child Esmeralda G., files this petition for extraordinary writ challenging the findings and orders of the juvenile court in setting a hearing pursuant to Welfare and Institutions Code section 366.26.[1] (§ 366.26, subd. (*l*); Cal. Rules of Court, rule 39.1B.) Father argues that the juvenile court erred in ordering a bypass of reunification services pursuant to section 361.5, subdivision (b)(10)(B) (prior termination of parental rights). Specifically, father contends that the bypass provision does not apply to him since he was not a presumed father in the prior dependency proceedings and thus was not a "parent" in the previous proceedings. Father also maintains that the bypass provision does not apply unless the parent was the custodial parent of the sibling or half sibling. In addition, father argues that there was insufficient evidence to support the juvenile court's findings that he had not made reasonable efforts to treat the problems that led to the removal of the child's siblings and that reunification services would not be in the best interest of the child.

We find that the bypass provision can be applied to a father whose parental rights to a sibling or half sibling were terminated while his status in the previous dependency proceeding was that of an alleged or biological father. Status as a presumed father of the sibling or half sibling is unnecessary. We also find that the bypass provision can be applied to a parent who was not the custodial parent of the sibling or half sibling. We also conclude that substantial evidence supports the juvenile court's findings and orders. Hence, we will deny the petition.

### FACTS AND PROCEDURAL HISTORY

On September 6, 2000, the Stanislaus County Community Services Agency filed a petition as to the child Esmeralda G. (born August 2000), pursuant to section 300. The child was ordered detained the next day. The petition was soon followed by a first amended petition filed on September 28, 2000, pursuant to section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling). The first amended petition alleged that mother, Cecilia G.,[2] and father had traveled to Modesto from Watsonville for the child's birth in an attempt to conceal the birth from child protective services in Santa Cruz County. At the time of the child's birth, both mother and child tested positive for cocaine. Similarly, three of the child's siblings, Corina G. (born April 1996), Stephanie G. (born June 1998) and Francisco G. (born

---

[1] Further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] Mother has not petitioned this court for relief.

October 1999), tested positive for cocaine at the times of their births in Santa Cruz County. In addition, the siblings were the subject of juvenile dependency proceedings in Santa Cruz County that resulted in the termination of the parental rights of both mother and father. Mother's parental rights to an older half sibling, James G., were also terminated.

The Stanislaus County social worker's jurisdictional/dispositional report detailed the history of the previous dependency proceedings involving mother and father. In April 1996, the child's sibling, Corina, was detained because she tested positive for cocaine at birth, and she was subsequently adjudicated a dependent of the court. The dependency proceeding was eventually dismissed at the 18-month review on June 5, 1998. However, mother soon gave birth to Stephanie, who tested positive for cocaine, and dependency petitions were filed in July 1998 as to the three children, James, Corina, and Stephanie. The petitions were based on allegations of mother's substantial history of drug abuse and father's history of domestic violence and substance abuse. Father was identified as the alleged father of Stephanie, and he had been adjudged the biological father of Corina.[3] Father appeared and was represented by counsel during the dependency proceedings involving Corina and Stephanie, but father's (and mother's) parental rights were eventually terminated by the juvenile court in December 1998.

In October 1999, mother gave birth to another child, Francisco, who also tested positive for cocaine at birth. A dependency petition was filed in November 1999, alleging mother's extensive substance abuse, father's alcohol abuse, father's history of domestic violence, father's denial of mother's drug problem, and alleging the prior termination of parental rights as to the older siblings and half sibling. Father was identified as the alleged father of Francisco and was represented by counsel during the dependency proceedings. Francisco was found to be a dependent of the court, reunification services were ordered bypassed, and the parental rights of mother and father were eventually terminated in June 2000.

The social worker also reported that mother gave birth to the child Esmeralda in August 2000 and that mother and child tested positive for cocaine. Mother told the social worker that she intended to deliver the child in Mexico in order to avoid child protective services, but she went into labor earlier than expected so she and father came to Modesto for the delivery. At the hospital, mother used a different name in an attempt to conceal her identity. Both mother and father signed a declaration of paternity at the time of Esmeralda's birth. Mother told the social worker that she did not believe she had a problem with drugs because she did not use every day and that she

---

[3]Petitioner was not alleged to be the father of mother's oldest child, James.

just had "bad luck." Father had been arrested twice for abuse of mother, and mother reported that their arguments were primarily verbal. Mother also stated that she no longer wanted to live with father, but he did not want her to leave.

In addition, father had a history of alcohol problems, and he admitted that alcohol was a factor in his arrest for domestic violence against mother. There were no indications that father successfully completed any programs related to the abuse. Father also reported to the social worker investigating Francisco's dependency proceeding in 1999 that he drank about four beers a day and more on the weekends; however, mother now reported that father no longer drinks and that there have been no further episodes of domestic violence since he stopped drinking. Mother and father have been in a relationship for about six years, but father apparently spent some of the time in Los Angeles, where he has a wife.

The social worker also reported that there was no indication that the parents had subsequently made a reasonable effort to treat the problems that led to the removal of the siblings. Mother was clearly not interested in pursuing treatment and was only willing to do so if she could have custody of the child. Father's alcohol and domestic violence issues had not been adequately addressed, and he did not appear to appreciate the seriousness of mother's continued substance abuse. Father reported that he attended 12 meetings for domestic violence after his arrest in 1997 and that he received a letter of completion to take to court to have his case dropped. Father also admitted that drinking was involved in the domestic violence, and he reported that he attended some Alcoholics Anonymous (AA) meetings. However, there was no indication that he participated in any services during the previous dependency proceedings.

The social worker recommended that the child be made a dependent of the court with out-of-home placement and that the parents not be offered reunification services. The social worker also recommended that the matter be transferred to Santa Cruz County since the parents were residents of Santa Cruz County, had lived in the same residence there for two years, and had purposefully traveled to Stanislaus County for the birth of the child in order to evade Santa Cruz County authorities. On November 3, 2000, the juvenile court in Stanislaus County found that the allegations of the first amended petition were true and that the child came within the provisions of section 300, subdivisions (b) and (j). The court also transferred the case to Santa Cruz County for disposition.

After the case was transferred to Santa Cruz County, the Human Resources Agency of Santa Cruz County (the Agency) submitted a dispositional report, prepared on January 10, 2001, expressing its agreement with

the dispositional recommendation of the Stanislaus County social worker that reunification services be denied to both parents. After several settlement conferences and continuances, the juvenile court in Santa Cruz County conducted the contested dispositional hearing on April 10, 2001.

At the contested dispositional hearing, the social worker testified that the child would be in substantial danger in the care of the parents. The social worker had been the social worker for the child's siblings and had worked with the parents in the past. According to the social worker, the parents had recurring problems that led to a fourth child being born drug-exposed. Both mother and father continued to believe that mother did not have a drug problem, and father did not believe that he had an alcohol problem. The social worker also believed that father knew mother was using drugs since he had been through the hearings in the earlier dependency proceedings involving the child's siblings. In addition, father left Santa Cruz County with mother for the birth of the child in order to avoid the child being removed by child protective services.

The social worker also testified that there was some indication father had attended some court-directed domestic violence counseling after his second domestic violence arrest, but she had not seen any proof of completion, and that she had no knowledge of father completing any kind of drug or alcohol rehabilitation program. The social worker also expressed concern about father continuing his relationship with mother and concern that his home life seemed to be unsettled since he was married to a woman in Southern California and visited her periodically.

The social worker also testified that mother and father had been living together with father's relatives, but mother told the social worker on the day of the contested hearing that she was no longer seeing father. The social worker's most current information regarding father's alcohol usage was his admission in 1999 to consuming four beers per day and more on the weekends. The social worker still believed that father had an alcohol problem because she had no evidence that anything was different with the family. Mother had told the social worker in the past that father had been physically violent with her, and mother told another social worker that she and father had a physical altercation in the street after father went through the domestic violence diversion program, resulting in their arrest.

The social worker believed that it was in the best interest of the child to be placed in a stable, loving home instead of with father because the parents have had a conflicted relationship and each repeatedly denies the other has a problem.

Father also testified at the contested hearing. Father explained that he was working a seasonal job as a lettuce picker when mother was pregnant with Corina and Stephanie. He would work locally from April to October and then he would go to Los Angeles to work in a factory. Father stated that he was not aware that mother was using cocaine during any of the four pregnancies because he was working and was not taking care of her. After the first three babies were born testing positive for cocaine, father suspected that she was "doing something." Father also testified that before Esmeralda's birth, mother told him that she was not using anymore. He never saw her doing drugs, but she sometimes looked "suspicious." However, he never confronted her about it. Father now believes that mother has a drug problem, and he is not seeing her anymore. He also had no intention of continuing the relationship in the future because their children had been taken from them.

Father also testified that he was charged with domestic violence, but the case was dismissed after he completed a domestic violence program and went to AA. He stopped drinking around July 2000 and was currently attending AA meetings almost every day, but he was unable to explain the steps of the program. At the behest of his attorney, father also began attending weekly classes at Fenix Services, and he had attended approximately eight or nine classes at the time of the hearing.

Father also explained that he and mother went to Stanislaus County to visit family, but she started having pains early. He denied leaving Santa Cruz County in an attempt to avoid child protective services. He was also unaware that mother was using cocaine just before the child was born. He also stated that mother did not have any drugs after they left Santa Cruz since they were with family and he was with her every moment.

According to father, he decided approximately two weeks before the hearing that he no longer wanted to be with mother, and he did not plan to raise the child with her. Father stated that his sister, who lived with him, and their grandmother would help him raise the child. Although father did not know how to tell if mother was using drugs, he believed that mother was safe to be around the child without supervision. Father also testified that he would be able to abide by an order not allowing mother unsupervised visits with the child, but he did not understand why the court might want to make such an order.

At the conclusion of the contested dispositional hearing, the juvenile court declared the child a dependent of the court and ordered out-of-home placement. The juvenile court also ordered a bypass of reunification services as to both mother and father. The juvenile court noted that father had a long

history with mother and had lost three children already due to mother's substance abuse and father's failure to recognize that her drug problem also seriously affected his life as well. The juvenile court also noted that father lived with mother and yet was unable to recognize that mother's substance abuse was a problem after losing three children. The juvenile court also believed that this was an aggravated case in light of this being the fourth child the couple was losing because of these problems. Although the juvenile court commended father for commencing efforts to attend Fenix Services and AA, the juvenile court did not believe that father had made reasonable efforts to treat the problems within the family unit. The juvenile court set a section 366.26 hearing for August 17, 2001.

## DISCUSSION

A. *Bypass of Reunification Services After Prior Termination of an Alleged or Biological Father's Parental Rights—Section 361.5, Subdivision (b)(10)(B):*

Father contends that the bypass provision of section 361.5, subdivision (b)(10)(B) does not apply to him because he was not a presumed father and thus was not a "parent" in the previous dependency proceedings. The Agency argues that father was a "parent" under the law at the time his parental rights were terminated in the siblings' dependency proceedings since alleged and biological fathers have rights protected by law that simply differ in degree, not in kind, from those of presumed fathers.

The record indicates and the parties do not dispute that father is the presumed father of the child Esmeralda but was never more than the biological or alleged father of the child's siblings Corina, Stephanie, and Francisco. Since father's argument is premised on his status as a biological or alleged father during the previous dependency proceedings, we first note some of the relevant distinctions between "presumed," "biological," and "alleged" fathers.

In order to become a "presumed" father, a man must fall within one of several categories enumerated in Family Code section 7611. Under Family Code section 7611, a man who has neither legally married nor attempted to legally marry the child's natural mother cannot become a presumed father unless (1) he receives the child into his home and openly holds out the child as his natural child, or (2) both he and the natural mother execute a voluntary declaration of paternity. (See Fam. Code, §§ 7611, 7570; *Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1050-1051 [43 Cal.Rptr.2d 445, 898 P.2d 891, 61 A.L.R.5th 769]; *In re Liam L.* (2000) 84 Cal.App.4th

739 [101 Cal.Rptr.2d 13].) A presumed father is entitled to custody and reunification services. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 448-449, 451 [24 Cal.Rptr.2d 751, 862 P.2d 751].)

■ In contrast, a "biological" or "natural" father is one whose biological paternity has been established, but who has not achieved presumed father status as defined in Family Code section 7611. "[A] biological father's paternal rights may ultimately be terminated in the dependency process. Such termination is almost inevitable if a father is not involved in the dependency process prior to the section 366.26 hearing." (*In re Zacharia D.*, *supra*, 6 Cal.4th at p. 451.)

■ An "alleged" father refers to a man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status. (*In re Zacharia D.*, *supra*, 6 Cal.4th at p. 449, fn. 15.) "An alleged father in dependency or permanency proceedings does not have a known current interest because his paternity has not yet been established." (*In re Emily R.* (2000) 80 Cal.App.4th 1344, 1352 [96 Cal.Rptr.2d 285].) An alleged father is entitled to notice of the proceedings, which provides an opportunity for him to appear and assert a position. (*In re Joseph G.* (2000) 83 Cal.App.4th 712, 715 [99 Cal.Rptr.2d 915].) An alleged father who fails to become a party of record in the dependency court proceedings has no standing to appeal an order terminating his parental rights. (*Id.* at pp. 715-716.) Pursuant to section 316.2, subdivision (b), each alleged father must be provided notice that he is or could be the father of the child, that the child is the subject of proceedings under section 300, and that the proceedings could result in the termination of parental rights and adoption of the child.

■ As correctly pointed out by petitioner, presumed fathers possess far greater rights than alleged or biological fathers. (See *In re Zacharia D.*, *supra*, 6 Cal.4th at pp. 448-449.) Only a presumed, not a mere biological, father is a "parent" entitled to receive reunification services, and only a presumed father is entitled to custody of his child. (*Id.* at p. 451.) In contrast, the juvenile court "may" order reunification services for a biological father if the court determines that the services will benefit the child. (§ 361.5, subd. (a).) While petitioner correctly notes the greater parental rights of a presumed father, by the same token, the Agency is correct that an alleged or biological father does in fact have parental rights that simply differ in degree to the parental rights conferred on a presumed father and that the parental rights of each category of father may be terminated in a dependency proceeding.

■ With this background in mind, we now turn to whether the bypass provision of section 361.5, subdivision (b)(10)(B) can be appropriately

applied to a father who was only an alleged or biological father during the sibling's dependency proceedings. ■ In interpreting this bypass provision, we bear in mind that one section of the dependency law may not be considered in a vacuum, and it must be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [19 Cal.Rptr.2d 544, 851 P.2d 826].) "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time." (*Ibid.*) The underlying purpose of dependency law is to protect the welfare and best interests of the child. (See, e.g., *In re Malinda S.* (1990) 51 Cal.3d 368, 384 [272 Cal.Rptr. 787, 795 P.2d 1244].)

Section 361.5, subdivision (a) provides in relevant part: "whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians. Upon a finding and declaration of paternity by the juvenile court or proof of a prior declaration of paternity by any court of competent jurisdiction, the juvenile court may order services for the child and the biological father, if the court determines that the services will benefit the child." Hence, the presumed father is generally entitled to reunification services, but a mere biological father only has the possibility of services if the juvenile court makes the appropriate determination. This distinction reflects a policy determination that it is generally in the best interests of the child to be reunited with his or her presumed father, but not necessarily with a mere biological father. As to a biological father, the issue is left to the discretion of the juvenile court and its determination of the benefit to the child of providing services.

While a presumed father is generally entitled to reunification services, subdivision (b) of section 361.5 sets forth a number of circumstances in which reunification services may be bypassed altogether. These bypass provisions represent the Legislature's recognition that it may be fruitless to provide reunification services under certain circumstances. (*Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 163 [64 Cal.Rptr.2d 33].) Specifically, "[r]eunification services need not be provided to a parent or guardian . . . when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (10) That . . . (B) the parental rights of a parent or guardian over any sibling or half-sibling of the child had been permanently severed, and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half-sibling of that child from that parent or guardian." (§ 361.5, subd. (b)(10)(B).)

As noted above, our Supreme Court has determined that, for purposes of section 361.5, subdivision (a), the term "parent" refers only to a presumed father and that only a presumed father is entitled to reunification services. (*In re Zacharia D., supra*, 6 Cal.4th at p. 451.) For purposes of the bypass provisions of the same statute, i.e., subdivision (b), it follows that the term "parent" also generally refers to the presumed father who is otherwise entitled to receive reunification services pursuant to subdivision (a).

Turning to the bypass provision at issue, section 361.5, subdivision (b)(10)(B) concerns the situation in which "parental rights of a parent" over a sibling or half sibling have already been severed. Hence, we are concerned with petitioner's status in two separate dependency proceedings, i.e., the current dependency involving the child and the previous dependency involving a sibling. When read in isolation, the phrase "parental rights of a parent" is arguably ambiguous as to whether the term "parent" refers to petitioner's status vis-à-vis the child or the sibling.

However, when read in context, we believe that the term "parent" as used in section 361.5, subdivision (b)(10)(B) refers to petitioner's status in the current dependency proceedings and not to petitioner's parental status in the sibling's dependency proceedings. In other words, the usage of the term "parent" simply refers to the fact that petitioner is only otherwise entitled to reunification services because he is the presumed father of the child Esmeralda who is the subject of the current dependency proceedings. Such usage does not refer to the nature of the previously terminated rights, but rather to petitioner's current status in the current dependency. As a result, the bypass provision can be appropriately applied to a father whose parental rights as an alleged or biological father of a sibling or half sibling have been terminated.

Furthermore, we believe that such interpretation is in harmony with the underlying purpose of the dependency scheme to protect the welfare and best interests of the child. To bar application of the instant bypass provision simply because the child's parent did not achieve presumed father status as to the sibling or half sibling would be to ignore the best interests of the child. If the child's parent has suffered the previous termination of parental rights as to a sibling or half sibling, there is the potential that providing reunification services would be fruitless in light of the parent's past history. It is in the child's best interest to permit the juvenile court to examine such past history and make the appropriate bypass determination rather than delay permanency for the child.

In reaching our conclusion, we acknowledge that the greater parental rights possessed by a presumed father provide a presumed father with a

greater ability than an alleged or biological father to prevent the termination of parental rights as to the sibling or half sibling. Nevertheless, we believe that the rights of the parent as to the child are adequately protected by the statutory scheme. While the prior termination of parental rights triggers the potential application of the bypass provision, the juvenile court must still inquire, under the second prong of section 361.5, subdivision (b)(10)(B), into the nature of the prior problems and into whether the father has taken reasonable steps to resolve the prior problems. Furthermore, even if the parent is found to fall within the bypass provision, the juvenile court is still empowered to order reunification services if it finds that reunification services are in the best interests of the child. (§ 361.5, subd. (c).)

We therefore conclude that section 361.5, subdivision (b)(10)(B) can be appropriately applied to a father who was only an alleged or biological father during the sibling's dependency proceedings.

B. *Application of Section 361.5, Subdivision (b)(10)(B) to Noncustodial Parent:*

 Father also contends that section 361.5, subdivision (b)(10)(B) does not apply unless the previous termination of parental rights was as to the custodial parent of the child's sibling or half sibling. Father's argument concerns the additional requirement of the bypass provision that "this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half-sibling of that child from that parent or guardian." (§ 361.5, subd. (b)(10)(B).) According to father, the siblings could not have been removed from his care because he was not entitled to custody of the siblings since he was never more than a biological father in the prior dependency proceedings.

However, we do not believe that the bypass provision should be given such a narrow construction. As discussed above, the term "parent" as used in this bypass provision should be understood to refer to the father's status as a "parent" of the child, not the sibling. In addition, the statutory language makes no mention of the custodial status of the sibling at the time of removal, much less require previous custody of the sibling. We decline to read such a requirement into the provision.

C. *Sufficiency of Evidence:*

 Father also asserts that there was insufficient evidence to support the juvenile court's determination that he had not made reasonable efforts to treat the problems that led to the removal of the siblings (§ 361.5, subd.

(b)(10)(B)) and that there was insufficient evidence to support the juvenile court's determination that reunification services would not be in the child's best interest (§ 361.5, subd. (c)). The Agency argues that substantial evidence supports the juvenile court's determinations. The Agency is correct.

■ "In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible. Where there is more than one inference which can reasonably be deduced from the facts, the appellate court is without power to substitute its deductions for those of the trier of fact." (*In re Katrina C.* (1988) 201 Cal.App.3d 540, 547 [247 Cal.Rptr. 784].)

■ Here, father had a long-standing relationship with the mother, and their parental rights had been terminated as to three siblings of the child. During the prior dependency proceedings, father was an active participant and was represented by counsel. While it appears that father's history of domestic violence and alcohol abuse played a role in the removal of the three siblings, the key problem was mother's substance abuse and father's failure to protect the siblings from such abuse. As noted by the social worker, the parents' recurring problems led to a fourth child being born drug-exposed, and both mother and father continued to believe that mother did not have a drug problem.

The record also indicates that father knew or should have known that mother had a drug problem prior to the birth of the child Esmeralda. The three siblings, Corina, Stephanie, and Francisco, all tested positive for cocaine at birth. Since the birth of the oldest sibling Corina in April 1996, mother and father have been involved in sibling dependency proceedings almost constantly. Corina tested positive for cocaine at birth in April 1996 and was the subject of dependency proceedings, which were ultimately dismissed in June 1998. Soon thereafter, Stephanie was born in June 1998, and tested positive for cocaine, and dependency petitions were filed as to Corina and Stephanie, leading ultimately to the termination of petitioner's parental rights as to Corina and Stephanie in December 1998. Mother soon gave birth in October 1999 to a third sibling, Francisco, who also tested positive for cocaine, leading once again to a dependency proceeding resulting in the termination of petitioner's parental rights in June 2000.

Meanwhile, mother became pregnant with the child Esmeralda. Mother and father left Santa Cruz County to avoid child protective services, and

mother gave birth to the child under a false name in Stanislaus County in October 2000. Like her three siblings, Esmeralda tested positive for cocaine at birth, resulting in the current dependency proceedings.

Despite his history of denying that mother had a drug problem and denying that he ever knew mother was using drugs, father finally admitted that mother had a drug problem at the contested dispositional hearing in April 2001. Furthermore, although father originally told the social worker that he wanted to raise the child with mother, it was not until two weeks before the contested hearing that he decided he no longer wanted to be with mother. Although father claimed to have been attending AA for years, he did not know any of the program steps, and he had only recently begun attending sessions at Fenix Services at the behest of his attorney. Father did not know how to tell if mother was using drugs, believed mother was safe to be around the child without supervision, and did not understand why the court might want to make an order prohibiting mother from being with the child unsupervised.

In light of the prior history, father's recent efforts simply came too late. Under the circumstances, the juvenile court could reasonably conclude that father had not made a reasonable effort to treat the problems that led to the removal of the siblings and that it was not in the best interests of the child to provide father with reunification services. As a result, substantial evidence supports the juvenile court's determination to bypass reunification services.

Disposition

The petition for extraordinary writ is denied.

Bamattre-Manoukian, J., and Wunderlich, J., concurred.