Filed 5/21/15  In re L.J. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

| | |
|---|---|
| In re L.J. et al., Persons Coming Under the Juvenile Court Law. | C076718 |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.J.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. 12JVSQ2946401, 12JVSQ2946501) |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>T.C.,<br><br>Appellant. | C076757 |

1

Appellants A.J. (mother) and T.C. (maternal grandmother) of the minors N.J. and L.J., appeal from the juvenile court's orders denying maternal grandmother's request to intervene as the minors' Indian custodian and reinstating prior orders terminating parental rights. On appeal, maternal grandmother contends she was entitled to appointed counsel at the hearing on whether she was an Indian custodian, and mother and maternal grandmother jointly contend that the juvenile court erred in finding maternal grandmother was not an Indian custodian. However, only an established Indian custodian is entitled to counsel. A person claiming Indian custodian status does not have a sufficient interest in the proceeding to determine whether she is an Indian custodian to warrant a right to counsel.

We shall determine that maternal grandmother was not an Indian custodian and shall affirm the juvenile court's orders.

BACKGROUND

The minors are twins born in June 2012. On September 20, 2012, the Shasta County Health and Human Services Agency (Agency) received a referral that maternal grandmother had N.J. in her care. Maternal grandmother said L.J. was with mother in Sacramento, where mother was struggling with postpartum issues and having to care for twins. Maternal grandmother had an extensive child welfare history for abuse and neglect, with approximately 20 referrals in Shasta and Humboldt Counties, and was denied relative placement at least four different times. On September 25, 2012, maternal grandmother told the Agency that mother was doing better and both minors were now in mother's care.

N.J. was admitted to Mercy Medical Center in Redding for dehydration and inconsolable crying on September 26, 2012. The staff had a concern about the minors' safety after maternal grandmother gave inconsistent stories to staff about who had custody of the minors and lacked documentation to authorize medical treatment. Maternal grandmother subsequently gave inconsistent stories to the police regarding who

2

had custody of the minors.  The father, N.J., who had outstanding warrants for absconding from parole and a mutual no contact order with mother, was in maternal grandmother's home with L.J.  Mother was diagnosed with bipolar disorder, major depressive disorder, posttraumatic stress disorder, schizophrenia, attention deficit hyperactive disorder, and borderline and antisocial personality disorders.  Father was diagnosed with schizophrenia.  The parents had extensive criminal records which included domestic violence convictions.  The minors were placed in protective custody that day.

The Agency filed a dependency petition alleging jurisdiction over the minors (Welf. & Inst. Code, § 300)[1] based on the incident involving N.J., and the parents' history of child neglect, history of substance abuse, mental health issues, and domestic violence.  The juvenile court detained the minors in October 2012.

The November 2012 disposition report related that mother's and father's parental rights to their three other children had been terminated, and that mother's parental rights to another child had also been terminated.  Mother was a member of the Citizen Potawatomi Nation and the minors were eligible for tribal membership.

The juvenile court sustained the petitions and bypassed services for both parents pursuant to section 361.5, subdivisions (b)(10), (b)(11), and (b)(13).  The March 2013 section 366.26 report noted that the minors were placed with a potential adoptive family who understood the importance of the minors' Indian heritage and was committed to keeping them in contact with their three older siblings.  The Agency was working with the Citizen Potawatomi Nation to ensure the minors' enrollment.

The juvenile court terminated parental rights on May 1, 2013.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

Maternal grandmother filed a notice for intervention as an Indian custodian and a request for appointment of counsel in November 2013. The juvenile court deferred ruling on the request pending an action on the matter by this court in mother's appeal from the termination of parental rights.

In the appeal from the juvenile court's orders, mother and the Agency entered into a stipulated reversal, which we accepted on February 27, 2014. The orders terminating parental rights were reversed and the matter was remanded for the juvenile court to hold further proceedings to determine if minors had an Indian custodian pursuant to the Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.) The orders provided that if the juvenile court found there was no Indian custodian, the orders terminating parental rights would be reinstated. If the court found there was a custodian, it was to proceed under the directives of the ICWA.

The record shows that maternal grandmother told inconsistent stories concerning the custody of the minors. The Agency filed a report on the Indian custodian question in June 2014. The report noted that when maternal grandmother took N.J. to the emergency room for dehydration, she said that she had been caring for N.J. for the past two weeks. That day, she also told doctors that she was not N.J.'s legal custodian. She was interviewed for the hospital intake form, which reported that N.J. lived with mother, who had custody of the child. The day N.J. was admitted, mother, during a phone conversation with a doctor, started screaming that she wanted N.J. transferred to a Sacramento hospital. The doctor gave the phone to maternal grandmother, and mother continued screaming through the phone to maternal grandmother. Mother refused to provide the hospital with written authorization allowing maternal grandmother to provide medical care for N.J.

That same day, maternal grandmother told a police officer that she had temporary care of N.J., but lacked the paperwork to substantiate this. When father was arrested at maternal grandmother's home for absconding, the minor L.J. was in his care. Maternal

4

grandmother told an officer that she was providing care for the minors, but mother had custody of them. She then said the paternal grandfather had legal guardianship of the minors. She also told the officer that, while she was in the hospital, her daughter-in-law was caring for L.J. in her home.

After the minors were placed in protective custody, mother asked the social worker why she had not been contacted. She told the social worker that she had asked maternal grandmother to care for the minors for two weeks while she got back into her programs and classes after her relapse.

Maternal grandmother was present at the courthouse on the day of the detention hearing, but did not attend. She was given, but did not fill out, an ICWA-030 form. At the detention hearing, no party asserted that maternal grandmother was the minors' Indian custodian or that legal custody of the minors had been transferred to her. During the dependency, maternal grandmother requested consideration for relative placement but never said she was the minors' Indian custodian. The juvenile court ruled at the disposition hearing that maternal grandmother was not a possible placement source for the minors. Maternal grandmother has had no contact with the Agency since October 1, 2012, and has not requested contact or visitation with the minors since that date.

In May 2014, Laurie Clark, the representative for the Citizen Potawatomi Nation, told the Agency that maternal grandmother had not contacted the tribal court or any person in the tribe to initiate a tribal guardianship for the minors. Asked if the maternal grandmother met the tribe's definition of traditional custodian, Clark replied that the tribe needed more information to give an answer. A social worker's log indicated that Clark also told the social worker that it was the general practice of relatives raising a Potawatomi relative's children to contact the tribal court for an emergency legal guardianship. The tribe held phone court for relatives seeking guardianship in other states and no attorney is required to obtain such a guardianship. The social worker's

5

notes indicated that Clark also said that she thought maternal grandmother would meet the Indian custodian criteria under the tribe's code.

Clark also told the Agency that the tribe did not have a tribal home or specified home available in California for permanency. The tribe's preference was for the minors to be placed close to their siblings so as to maintain contact. The tribe continued to support the minors' placement with the prospective adoptive parents.

Maternal grandmother testified at the contested hearing on her request. She related that mother told her she had postpartum depression and asked maternal grandmother if she could help by taking the minors for a couple of weeks. Maternal grandmother agreed, and arranged a ride to and from Sacramento to get the minors. After she had the children for a week, mother told her she had given her the wrong formula. Maternal grandmother obtained a half-can of the correct formula, but had to take N.J. to the doctor. She also told the juvenile court that she loved her grandchildren and would never harm them. On cross-examination by counsel for the Citizen Potawatomi Nation, she testified that when she took N.J. to the hospital, her responsibilities were to meet his needs and get the care he needed so he could get home.

Counsel for the Citizen Potawatomi Nation told the juvenile court the Citizen Potawatomi Nation Juvenile Code defines traditional custodian as: "those relatives of the child who, by force of tradition, customs and common law of the tribe have the right, duties and responsibilities of assisting the parent and rearing the child and providing support." The tribe had regular procedures to establish custody as an Indian custodian. The relative would apply for a guardianship through the tribe or through the state court. According to counsel, "I'd encourage that if you are going to bear the legal responsibility for the child that you would pursue a legal guardianship."

The juvenile court found maternal grandmother was not an Indian custodian when the minors were detained and denied her request and reinstated its prior orders terminating parental rights.

DISCUSSION

I

Mother and maternal grandmother contend that the juvenile court erred in finding maternal grandmother was not an Indian custodian under the ICWA. We disagree.

" 'Indian custodian' " is defined as "any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child." (25 U.S.C. § 1903(6).) California incorporates this definition in its legislation implementing the ICWA. (§ 224.1, subd. (a).) The term "Indian custodian" is defined by reference to tribal law or custom and to state law. (*Mississippi Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 47, fn. 22 [104 L.Ed.2d 29, 45, fn. 22].)

The "designation of an Indian custodian by a parent does not require a writing. [Citation.]" (*In re G.L.* (2009) 177 Cal.App.4th 683, 693.) An informal transfer of custody of an Indian child to an extended family member can create an Indian custodianship. (*Ibid.*) The term Indian custodian was added to the ICWA in order to protect the rights of extended family members recognized under Indian custom. (*In re G.L.,* at pp. 691-692.) "To impose standards regarding the nature, frequency, and duration of the Indian child's contacts with his or her Indian custodian would essentially ignore the critical role of extended family in Indian society, and thereby perpetuate one of the problems that Congress expressly sought to remedy by enacting ICWA." (*Id.* at p. 693.)

The inquiry into whether a person was an Indian custodian is essentially factual, that is, whether there was transfer of an Indian child's custody to a person who qualifies as an Indian custodian under the relevant tribal custom or law. We therefore review the juvenile court's decision under the deferential substantial evidence standard. (*People v. Ochoa* (1998) 19 Cal.4th 353, 408; *In re K.P.* (2012) 203 Cal.App.4th 614, 622; see also *Fresno County Dept. of Children & Family Services v. Superior Court* (2004)

7

122 Cal.App.4th 626, 644-646 [decision to bypass ICWA placement preference reviewed for substantial evidence].)  Under this standard, we construe the evidence most favorably to the juvenile court's ruling and resolve all conflicts in the evidence in favor of that ruling.  (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400-1401.)

The evidence that mother transferred custody of the minors to the paternal grandmother as an Indian custodian was equivocal and compromised.  Although maternal grandmother took N.J. to the emergency room, she gave conflicting information regarding whether she had custody of the children.  For example, while she told police that she provided care for the minors, mother had custody of them.  Likewise, she told doctors that mother had custody of N.J. and that N.J. lived with mother.  Indeed, maternal grandmother's inconsistent and equivocal answers regarding who had custody of the minors was one reason that they were placed in protective custody.

Additional facts undercut any claim that maternal grandmother was an Indian custodian.  L.J. was found with father at maternal grandmother's house the day N.J. was admitted to the hospital.  While the Citizen Potawatomi Nation had a specific procedure for establishing an Indian custodian, maternal grandmother did not avail herself of this procedure to establish herself as the minors' Indian custodian.  While the tribe was represented at the hearing on maternal grandmother's request to be recognized as an Indian custodian, the tribe did not claim she was the minors' custodian and did not object to the trial court's ruling denying the request and reinstating the orders terminating parental rights.  Finally, we find it telling that an alleged Indian custodian of the minors did not visit or request contact with the minors since October 1, 2012, five days after they were placed in protective custody.

The record here provides ample support to the juvenile court's finding that maternal grandmother was not an Indian custodian of the minors.  There is evidence she did not have custody of the minors and did not consider herself to be their custodian.  She

8

never tried to meet the tribe's requirements for establishing a custodianship, and she essentially failed to have any contact with the minors throughout the dependency.

Since substantial evidence supports the juvenile court's finding, we reject mother's and maternal grandmother's claim that maternal grandmother was entitled to the benefits accorded an Indian custodian under the ICWA.

## II

Maternal grandmother contends the juvenile court deprived her of due process by failing to grant her request for counsel before the Indian custodianship hearing.

The right to counsel in dependency proceedings is generally reserved for parents and the minors. For example, section 317, subdivision (b) requires the juvenile court to appoint counsel for a "parent or guardian" who cannot afford one when the minor is placed in out-of-home care. Likewise, a parent has a due process right to counsel at termination of parental rights proceedings. (*Lassiter v. Department of Social Services* (1981) 452 U.S. 18, 31 [68 L.Ed.2d 640, 652] (*Lassiter*).) Indian custodians are an exception to this rule, as they are entitled to counsel even though they are not parents. (25 U.S.C. § 1912(b); *In re W.B.* (2012) 55 Cal.4th 30, 49 ["Indigent parents or Indian custodians have the right to court-appointed counsel.".])

However, maternal grandmother is neither. A "grandparent" is defined by the ICWA as an " 'extended family member,' " not as a parent. (25 U.S.C. § 1903(2).) Nor did she establish that she is an Indian custodian. The former distinguishes *Lassiter*, while the latter deprives her of the federal statutory right to counsel.

A person who may be entitled to counsel if he or she establishes a certain relationship to the minor is not entitled to counsel until that relationship is established. An alleged father, "a man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status" (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596), is not entitled to counsel. (*In re O.S.* (2002) 102 Cal.App.4th 1402, 1406.) Only by establishing

9

presumed father status may the man have a right to counsel.  (See § 317, subd. (b); *In re Zacharia D.* (1993) 6 Cal.4th 435, 451 ["[I]nterpreting 'parent' to include a strictly biological father would introduce into the dependency context fathers who had never demonstrated any commitment to the child's welfare."].)  Due process requires only that the alleged father be given notice and an opportunity to be heard.  (*In re J.H.* (2011) 198 Cal.App.4th 635, 644.)

Like an alleged father, a person claiming Indian custodian status does not have a sufficient interest warranting a right to counsel until the juvenile court finds such status exists.  Maternal grandmother therefore was not entitled to counsel at the hearing to determine whether she was the minors' Indian custodian.

DISPOSITION

The juvenile court's orders are affirmed.

               BLEASE    , Acting P. J.

We concur:

     BUTZ    , J.

     HOCH    , J.