Filed 8/27/15  In re K.G. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re K.G. et al., Persons Coming Under the Juvenile Court Law. | |
| MICHAEL G.,  Petitioner,  v.  THE SUPERIOR COURT OF SOLANO COUNTY,  Respondent;  SOLANO COUNTY HEALTH AND HUMAN SERVICES DEPARTMENT,  Real Party in Interest. | A145280  (Solano County Super. Ct. Nos.  J-42458, J-42459) |

Petitioner Michael G. (Father), father of seven-year-old K.G. and six-year-old C.G. seeks review by extraordinary writ, pursuant to California Rules of Court, rule 8.452,[1] of the juvenile court's findings and orders, in which the court terminated reunification services and set the matter for a permanency planning hearing, pursuant to Welfare and Institutions Code section 366.26.[2]  Father contends (1) substantial evidence does not support the juvenile court's order terminating reunification services, and (2)

---

[1] All further rule references are to the California Rules of Court.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

substantial evidence does not support the juvenile court's finding that reasonable services were offered to Father. We shall deny the petition for extraordinary writ.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 10, 2014, the Solano County Health and Social Services Department - Child Welfare Services (Department) filed an original petition alleging that K.G. and C.G. came within the provisions of section 300, subdivisions (b) and (g). Specifically, the petition alleged that, two days earlier, Father was arrested for possession of a controlled substance and child endangerment. During a search of Father's home, methamphetamine, a methamphetamine pipe, and other drug paraphernalia were found within reach of the children. Father also had a history of substance abuse, including methamphetamine and marijuana use, that had not been adequately addressed. Upon his arrest, Father was not able to make appropriate provision for the children's care. The petition also alleged that the children's mother (Mother) had a history of substance abuse and untreated mental health issues, which interfered with her ability to provide safe and adequate care for the children.

In the detention report dated April 10, 2014, the social worker reported that Father remained incarcerated. Several family members had been interviewed, including Mother, who said she had not spent time with the children for a few months and that she could not have them with her at that time because she was going through a " 'tough time.' " The maternal aunt, who had cared for the children for about a month the previous January, said that both parents had a drug history and Mother also suffered from depression. The maternal grandmother stated that she had recently witnessed Father shooting at a car right outside the family's apartment when she was there to pick up one of the boys. Both the maternal aunt and the maternal grandmother were concerned about the parents' ability to care for the children and were in the process of requesting legal guardianship.

The family had a prior child welfare history since 2008, which included substantiated allegations of general neglect and emotional abuse in March 2013, based on ongoing domestic violence between the parents, a dirty home, mother screaming at the

2

children, and medical neglect of the children. Although the family was referred for voluntary family services, the case was closed after the parents refused services.

On April 11, 2014, the juvenile court ordered the children detained.

In the jurisdiction/disposition report filed on April 28, 2014, the social worker reported that the children had been placed with the maternal aunt, and the maternal grandmother was caring for them while the maternal aunt was at work. K.G. was in the first grade and, in an interview with the social worker, was unable to identify what drugs and alcohol are, but said that Father smokes cigarettes a lot. He said that his parents "fought all the time" when they were together and that both parents spanked him on his bare bottom with a belt, which left bruises. K.G. said that he felt safe living with Father but only sometimes felt safe when living with Mother. The social worker also interviewed C.G., who said that, when he lived with both parents, he saw them fighting. When C.G. got in trouble, Father, Mother, or the paternal grandmother would spank him with a spoon or a belt. C.G. had seen Father smoke cigarettes or "cigars," which are made of glass. After smoking cigars, Father " 'acts strange,' " eating different foods and " 'talk[ing] grumpy.' " The maternal grandmother told the social worker that the children had been "passed around to various different relatives for awhile." She also said that, when K.G. was living with Father, he missed about two days a week of school. She had noticed many people staying at Father's apartment; at one point, there were at least five adults living there, with the children sharing the bottom bunk of a bed and another man sleeping on the top bunk.

Father had two pending criminal matters involving, inter alia, possession and transportation of methamphetamine for sale, being a felon in possession of a firearm, possession of burglary tools, and obstructing or delaying a police officer.

The Department recommended that K.G. and C.G. be adjudged dependent children and that the parents be offered reunification services. The proposed case plan for Father included the following objectives: to express anger appropriately and not act negatively on his impulses; to not behave in a manner that is verbally, emotionally, physically, or sexually abusive or threatening; to consistently, appropriately, and adequately parent the

3

children; to stay free from illegal drugs and show his ability to live free from drug dependency and to comply with all required drug tests. Father's case plan responsibilities would include participation in "counseling to address issues with anger management, domestic violence, parent/child relationship issues and resource management"; completion of a parenting skills program; participation in a substance abuse assessment and following up with recommendations of the assessment; and participation in random drug testing as requested by the Department. The Department also recommended that the parents receive one hour of supervised visitation per week.

At the May 13, 2014 jurisdiction/disposition hearing, the juvenile court dismissed the allegation under subdivision (g) of section 300 and sustained the amended petition, ordered out of home placement for the children, and reunification services for both parents.

In a status review report that was filed on October 14, 2014, the social worker reported that Father was incarcerated from June 13 to August 22. The social worker met with Father at the jail on June 24, at which time he denied physical domestic violence, but admitted to emotional and verbal abuse with Mother. While he was in jail, the social worker referred Father to one-on-one parenting education. Upon his release from jail, Father had said he was not on probation, but a probation officer subsequently informed the social worker that Father was required to check in with him and to drug test.

On August 27, Father met with the social worker to discuss his case plan and the social worker referred him to Solano County Mental Health Access for counseling services. In September, Father began participating in individual counseling and parenting education through the Healthy Partnerships outpatient substance abuse treatment program. Father had tested positive for marijuana on August 29 and September 17, 2014. Father told the social worker that he used marijuana "to treat moments of intense anxiety." While in jail, the social worker had coordinated substance abuse services during his incarceration, and Father had participated in anger management and relapse prevention through the Anka program. After his release from jail, he was referred to the

4

Behavioral Health Assessment Team (BHAT)[3] for a substance abuse assessment, and subsequently began participating in mood management, individual sessions with a counselor to address his substance abuse, and random drug testing. Father had also begun supervised visits with the children.

Both children had adjusted well to the home of the maternal aunt. They were receiving counseling services and their aggressive behavior toward each other had lessened. They appeared to be struggling with the separation from their parents, especially Father.

The Department recommended that the juvenile court order additional reunification services for father, but recommended that Mother's reunification services be terminated.

At the six-month status review hearing, which took place on November 4, 2014, the juvenile court extended reunification services for Father and terminated Mother's reunification services.

In a status review report filed on April 15, 2015, the social worker related that she had been meeting with Father at least once a month in addition to telephone calls to check on his progress and make inquiries as to his needs. Father had been living with his brother's family, but had told the social worker that the instability of the home contributed to his substance abuse. The Department also had intervened in the home due to his two nephews' exposure to drugs and alcohol. The Department had provided Father with information about alternative housing, but he had remained in the home.

Father's substance abuse counselor at Healthy Partnerships told the social worker in October 2014 that Father had not shown up to several individual and group counseling sessions. He further stated that Father was "currently in denial about his drug addiction, [was] going through the motions, and refuse[d] to participate in Narcotics Anonymous (NA)."

_____

[3] The social worker later confirmed that BHAT is a clearing house for substance abuse services, which assesses individuals and refers them to programs.

Regarding compliance with the general counseling/therapy component of his case plan, the social worker related that Father had informed her on December 9, 2014, that he had stopped participating in therapy because of his work schedule, but that he continued to participate in individual counseling through Healthy Partnerships. When the social worker explained that the Healthy Partnerships counseling was part of his substance abuse treatment and that he was also required to attend counseling to address his domestic violence, anger, and other issues, Father became angry. When the social worker attempted to explain that such counseling was part of his court-ordered case plan, Father "repeated several times it was not his problem and became confrontational . . . ." The social worker attempted to discuss the counseling requirement with Father a week later, but he again became angry and stated that he had previously initiated therapy on his own, and not because it was part of his case plan. Father had participated in a total of six therapy sessions in September and October before stopping.

In January 2015, the social worker spoke with the substance abuse counselor at Healthy Partnerships about the possibility of his providing Father with therapy, but learned that, because he was not a paid therapist, he was not approved to provide Father with general counseling. Father later told the social worker that he would begin therapy again with his former therapist. At a February meeting with Father, the social worker gave him the former counselor's contact information after he said he had not yet contacted her.

In March 2015, Father said he still had not contacted his prior therapist and expressed the feeling "that he was being set up for failure and [that] feeling overwhelmed was a trigger to his substance abuse." The social worker then agreed that he could work on his substance abuse treatment and parenting issues before returning to therapy, but made clear that he would have to complete the general counseling component of his case plan. The social worker then contacted Healthy Partnerships to try to arrange for a therapist to be assigned to provide general counseling for Father, along with other services.

In addition, Father had begun participating in a parenting education group at Healthy Partnerships in September 2014, but, in November, he had been asked to stop attending group meetings until his marijuana levels decreased. On January 14, 2015, the social worker had learned that Father was being discharged from Healthy Partnerships; one of the concerns was his minimal participation in groups. On February 18, Father was referred to the Suisun Family Resource Center (FRC) for parenting education. Although he participated in an intake appointment and one session, he failed to attend a subsequent session.

Between September 2014 and April 2015, Father had tested positive for marijuana three times, had tested positive for both marijuana and methamphetamine twice, and had not shown up for testing—considered a positive test—12 times. He had tested negative only twice, in December 2014 and January 2015. However, the drug tests showed that his marijuana levels had decreased over time. When the social worker raised Father's substance abuse issues, Father said he would start participating in Narcotics Anonymous (NA) meetings. He also said he was reluctant to take medication for his anxiety. During a February meeting with the social worker, Father said he did not believe that substance abuse treatment would help him maintain his sobriety. Rather, he thought that only he could do that and that keeping away from people who used drugs was a solution. Father's probation had been extended and he had been ordered to serve a 30-day sentence in jail because the discharge from his substance abuse program and testing positive for methamphetamine were probation violations.

Father had been consistently participating in supervised visitation with the children. The children had expressed to the social worker how much they missed Father and the desire to spend more time with him during supervised visits.

During the current reporting period, the social worker had "grown increasingly concerned about [Father's] willingness to collaborate with the Department and use the programs and services in place in order to address his substance abuse and personal issues through counseling. . . . It is the [social worker's] hope that the father is ready to benefit from this second reentry into the outpatient substance abuse program, however,

7

the Department cannot overlook [Father's] minimal progress in resolving the problems that led to the minors' removal and his inability to demonstrate his capacity and ability to complete the objectives of his treatment plan in order to provide for the minors' safety, protection, physical and emotional well-being." The Department therefore recommended that the juvenile court terminate Father's reunification services and set the matter for a section 366.26 hearing.

At the contested 12-month review hearing, which took place on May 26, 2015, social worker Veronica Ceja was qualified as an expert in the area of child welfare. Ceja testified that she had met with Father at least monthly since she was assigned to the case in June 2014. Father had completed a parenting program in April and had been participating in therapeutic visitation with the two children. Ceja understood that the visits were going well and that he engaged with the children appropriately.

Father had reenrolled in Healthy Partnerships' outpatient program in March 2015. Since then, he had missed two meetings in March and April, missed two drug tests in March, tested positive for (unspecified) drugs on May 1, and tested "dilute" on May 8 and May 18. Father also had failed to test on May 11, but had voluntarily tested on May 13; that test was negative. Father was at the same level of non-compliance with Healthy Partnerships as when he was previously discharged. He was in danger of being terminated again due to non-compliance. In addition, Ceja had met with Father the previous week, and he had told her that he did not believe he was receiving adequate support at Healthy Partnerships. He said he had looked into the Anka outpatient program, and Ceja had sent a referral to BHAT, requesting an assessment of Father in light of his request to change outpatient programs. Moreover, when Father did not contact his former therapist and said he was overwhelmed, Ceja had contacted Healthy Partnerships about assigning him a therapist there, so he could "do everything in-house." A therapist was not currently available there, however.

Ceja did not believe the children could be safely returned to Father at present. Nor did she believe there was a substantial probability that they would be returned to Father if he were provided an extension of reunification services to the 18-month date. She based

8

her opinion in part on his minimal participation in his outpatient drug treatment program and his failure to participate in counseling to address domestic violence or anger management, other than for two months during the first six months of reunification services. She was particularly concerned about Father's need to address anger management, given his expressions of anger when she raised the need to participate in therapy in January through March 2015. Based on a conversation she had with Father the previous week, Ceja did believe that Father had recently come to terms with the fact that he had a substance abuse problem, which he said he wanted to address.

Father also testified at the hearing. He had been working part-time since September or October 2014. He had successfully completed a seven-week parenting class. He was placed in custody on April 17, 2015, due to his discharge from the Healthy Partnerships program, which was a probation violation. Since his release from custody on May 1, he had reenrolled in Healthy Partnerships and had completed all of his drug tests. Although he wanted to be referred to a different substance abuse program— Anka—he would complete whatever program that was recommended. The social worker had brought up the possibility of residential treatment, but Father did not think being around so many addicts would be good for him.

Father had been visiting with the children weekly. They had begun therapeutic visitation in February 2015, and Father had learned how to talk to his children and how to be more understanding of their feelings and what they have to say. Father believed his home, which was owned by his grandparents, would be safe for the children now that his brother and sister-in-law had moved out, and no drugs were present.

On cross-examination, Father acknowledged that he had recently missed a drug test, on May 11, 2015. Although he was planning to attend three NA meetings the week of the hearing, he had last attended an Alcoholics Anonymous meeting in 2011 and had last attended an NA meeting when he was 13 years old. With respect to the general counseling requirement, Father was waiting for Healthy Partnerships to set up counseling for him. He had previously participated in therapy for a few months, but had stopped "because I was overwhelming myself with all the things I had to do, which was causing

9

me to relapse at the time." He hoped to enroll in the Anka program, where all of the services would be in one location.

At the conclusion of the hearing, the juvenile court ruled as follows: "[T]he findings I would make, first of all, I would find that [Father's] only had sporadic achievement in meeting the court-ordered goals, especially as it relates to the substance abuse issues and the testing for the presence of substance abuse, which, of course, is the basis of the petition that was sustained. The vast majority of his tests are either actually positive or presumptively positive, the vast majority, which does not address the reason that he's before the court today.

"Now, compounding the problems with respect to his substance abuse is his insistence that he deal with his substance abuse issues on his own terms. He wants to dictate to the social worker, and indirectly to the court, how he's going to deal with his substance abuse problem. And when you look at his history of testing, the positives, either actual or presumptive, it's clear that his approach doesn't work. He wants to control the environment in which he receives the substance abuse counseling, despite efforts to get him to participate in other ways.

"Now, his substance abuse history, coupled with his rationalization with why he can't participate in the kinds of abuse [*sic*] counseling that are being offered to him, leads me to conclude that there is a continuing detriment to the children, based upon the reason he's before the court and his sporadic, at best, response to resolving that issue over 12 months.

"And nothing that he's offered [here] in court, as he dances around the issue of why he hasn't really participated in substance abuse [*sic*] counseling, tells me that anything in the future is going to change in that regard. If it's not the kind of counseling that he thinks will be productive, he's not going to participate in it.

"So I would find, by a preponderance of the evidence, that the return of the children to the physical custody of the father would create a substantial risk of detriment to the children's safety, protection, or emotional well-being. [¶] I further would find that the county has offered reasonable services to the father to facilitate the return of the

10

children to the father. I would also find that there is not a substantial probability that the children would be returned within six months."

The court therefore terminated reunification services for Father and set the matter for a September 15, 2015 section 366.26 hearing.

On June 2, 2015, Father filed a notice of intent to file writ petition.

## DISCUSSION

### I. *Termination of Reunification Services*

Father contends substantial evidence does not support the juvenile court's order terminating reunification services.

Section 361.5, which governs the provision of reunification services, provides, inter alia: "Except as otherwise provided in subparagraph (C), for a child who, on the date of initial removal from the physical custody of his or her parent or guardian, was three years of age or older, court-ordered services shall be provided beginning with the dispositional hearing and ending 12 months after the date the child entered foster care as provided in Section 361.49, unless the child is returned to the home of the parent or guardian." (§ 361.5, subdivision (a)(1)(A).) Subdivision (a)(3) of that section further provides that "court-ordered services may be extended up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody of his or her parent or guardian if it can be shown . . . that the permanent plan for the child is that he or she will be returned and safely maintained in the home within the extended time period. The court shall extend the time period only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent or guardian within the extended time period or that reasonable services have not been provided to the parent or guardian. . . . The court shall also consider, among other factors, good faith efforts that the parent or guardian has made to maintain contact with the child." (§§ 361.5, subd. (a)(3); accord, 366.21, subd. (g).)

"[T]o find a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time, the court shall be required to find all of the following:

11

"(A) That the parent or legal guardian has consistently and regularly contacted and visited with the child.

"(B) That the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home.

"(C) The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1); accord, rule 5.715(b)(4)(A)(i).)

"We review the juvenile court's findings for substantial evidence, and the juvenile court's decisionmaking process based on those findings for abuse of discretion. [Citation.]" (*San Joaquin Human Services Agency v. Superior Court* (2014) 227 Cal.App.4th 215, 223 (*San Joaquin Human Services Agency*).)

In the present case, the evidence shows that Father consistently participated in weekly supervised visitation with the children, including therapeutic visitation, and that the visits were going well. (See § 366.21, subd, (g)(1)(A).) The evidence also shows, however, that Father failed to either make significant progress in resolving the problems that led to the dependency or demonstrate the ability to complete the objectives of his treatment plan and to provide for the children's safety and well-being. (See § 366.21, subd. (g)(1)(B) & (C).)

Although he had completed a parenting class, Father had participated only minimally in the key area of substance abuse treatment. He had been discharged once from the Healthy Partnerships outpatient treatment program in January 2015, after four months, during which time he had remained in denial about his substance abuse issues and participated only minimally in the program. He reenrolled in Healthy Partnerships in March 2015, but was in danger of being terminated again due to noncompliance. In addition, between September 2014 and May 2015, he had repeatedly failed to participate in random drug testing or, when he did test, tested positive for marijuana and/or methamphetamine, with only a few negative tests. He also agreed to attend NA meetings, but failed to do so. With respect to the general counseling/therapy component

12

of his case plan, in which he was expected to address, inter alia, domestic violence and anger management, Father had briefly participated in therapy, but only attended six sessions before he stopped attending in October 2014.

At the 12-month review hearing, the social worker testified that she did not believe there was a substantial probability that the children would be returned to Father within six months. Her opinion was based on his minimal participation in both his drug treatment program and therapy to address domestic violence and anger management. She was especially concerned about the anger management component, given the anger he had expressed toward her when she discussed the need for him to participate in therapy. The social worker believed that Father had only recently come to terms with the fact that he had a substance abuse problem.[4]

All of this evidence shows that, by the time of the 12-month review hearing, Father had failed to successfully make significant progress in most of the requirements of his case plan. He had made only minimal progress in resolving his substance abuse issues, and had not demonstrated the ability to meet the objectives of his case plan, which included, inter alia, to express anger appropriately and not act negatively on his impulses; to consistently, appropriately, and adequately parent his children; and to stay free from illegal drugs, show his ability to live drug-free, and comply with all required drug tests. (See § 366.21, subd. (g)(1)(B) & (C).)

Accordingly, we find there was substantial evidence to support the juvenile court's finding that there was not a substantial probability that the children would be returned to Father's physical custody after six additional months of reunification services. (See

---

[4] Although the social worker testified in May 2015 that Father had finally accepted that he had a substance abuse problem, in light of his failure to either acknowledge that problem or to meaningfully participate in most aspects of his case plan during the first 12 months of the dependency, the juvenile court was justified in finding that his realization came too late to warrant continuing reunification services for an additional six months. (Cf. *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 601 [substantial evidence supported juvenile court's decision to bypass reunification services where, in light of father's prior history, his "recent efforts simply came too late"].)

§§ 361.5, subd. (a)(3); 366.21, subd. (g).)  Because the juvenile court's findings were supported by substantial evidence, it did not abuse its discretion when it terminated Father's reunification services and set the matter for a section 366.26 hearing.  (See *San Joaquin Human Services Agency*, *supra*, 227 Cal.App.4th at p. 223.)

## II. *Reasonable Services*

Father contends substantial evidence does not support the juvenile court's finding that reasonable services were offered.  (See § 361.5, subd. (a)(3) [juvenile court must extend the time period for reunification services if it finds that reasonable services have not been provided to parent]; accord, § 366.21, subd. (g)(1)(C).)

A finding that reasonable services have been provided is appropriate when the record "show[s] that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ."  (*In re Riva M*. (1991) 235 Cal.App.3d 403, 414.)

Father claims the services provided to him were unreasonable in this case because the Department did not refer him to any anger management or domestic violence classes and failed to refer him to a therapist who was qualified to address these issues.  Father's contention ignores the record, which shows that the social worker met with him at least monthly about his case plan, with additional phone calls to check on his progress and inquire about his needs.  It also shows that she referred him to Solano County Mental Health Access for general counseling.  He began participating in therapy, but stopped after six sessions.  When the social worker thereafter attempted to discuss the general counseling requirement with Father, he became angry and confrontational.  A week later, she also raised the issue, at which time he again became angry.  The social worker then spoke with the substance abuse counselor at Healthy Partnerships, but learned that he was not approved to provide general counseling.  When Father later said he would begin meeting again with his former therapist, the social worker provided him with her contact information.  A month later, he still had not contacted the therapist, and told the social

worker that he was overwhelmed, which was a trigger for his substance abuse. The social worker then attempted to arrange for a therapist at Healthy Partnerships to provide Father with general counseling, although a therapist was not yet available. At the 12-month review hearing, Father testified that he was waiting for Healthy Partnerships to arrange counseling for him, and that he had stopped participating in therapy earlier because he was overwhelming himself with all he had to do, which was causing him to relapse.

The evidence thus shows that the Department attempted to provide Father with all needed services, including general counseling, but that Father failed to take advantage of the services offered. The evidence also shows that the Department "maintained *reasonable* contact with [Father] during the course of the service plan, and made *reasonable* efforts to assist [him] in areas where compliance proved difficult." (*In re Riva M.*, *supra*, 235 Cal.App.3d at p. 414; see also *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5 ["The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency of his or her minor children is not a requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions"].) Substantial evidence supports the juvenile court's finding that reasonable services were provided. (See §§ 361.5, subd. (a)(3); 366.21, subd. (g)(1)(C).)

## DISPOSITION

The petition for extraordinary writ is denied on the merits. Our decision is final as to this court immediately. (Rule 8.490(b)(2)(A).)

15

_____

Kline, P.J.

We concur:

_____

Richman, J.

_____

Stewart, J.

*In re K.G. et al.*  (A145280)

16