Filed 3/18/26 A.D. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| A.D., | |
| Petitioner, | E087543 |
| v. | (Super.Ct.No. DPSW2200014) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ. Sean P. Crandell, Judge. Petition denied.

Jaki Andrews for petitioner.

No appearance for Respondent.

Minh C. Tran, County Counsel, Jamila T. Purnell and Prabhath Shettigar, Deputy County Counsels, for Real Party in Interest.

1

Petitioner A.D. (father) filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452 challenging the juvenile court's orders terminating reunification services as to his children, N.D., L.D., and W.D. (the children), and setting a Welfare and Institutions Code[1] section 366.26 selection and implementation hearing.  He also argues the court erred in denying him reunification services under section 361.5, subdivision (b)(10) as to his child, M.D.  We deny the writ petition.

PROCEDURAL BACKGROUND

On September 14, 2023, the Riverside County Department of Public Social Services (DPSS) filed a section 300 petition, alleging that W.D. (the child), who was one month old at the time, came within subdivision (b) (failure to protect).  The petition alleged that the child's mother, R.N. (mother) had unresolved mental health issues and had previously been hospitalized for psychiatric issues; she neglected the child's health and well-being; she had a criminal history; and she and father (the parents) had a child welfare history, including a prior dependency case in August 2022 in which mother failed to participate in services and lost legal and physical custody of their two older children to father.

A social worker filed an Out of Custody report and recommended that the child remain in the parents' custody but be made available to DPSS for inspection to ensure his well-being.  The social worker reported that the child resided with mother in a back

---

[1]  All further statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

house, and father lived at the same address in the front house with their two older children, N.D. and L.D.

The social worker reported that DPSS received a referral stating that mother gave birth to a baby boy (the child) in an ambulance on August 5, 2023. Mother reported that she was afraid of blood and too tired to go see a doctor, so she received no prenatal care. It was reported that her mental health appeared unstable, as she would not make eye contact and was shaking, and she was dirty and emitted body odor. Mother was aggressive when nurses held the baby and rudely demanded they give him back to her. She tested negative for all substances.

The social worker met father in his home, and he stated that he and mother were not in a relationship. He was currently unemployed, and he supervised their children. Father denied that mother supervised the children or was ever left alone with them, but also said he did not believe they would be in danger around her.

DPSS was concerned for the child's safety, due to the mother's history of mental illness. She had previously been placed on section 5150 holds and had been prescribed medication. The parents expressed their willingness to enroll in services. Therefore, DPSS recommended that the child remain in the parents' care and said it would provide additional oversight to ensure his safety.

The social worker additionally reported on the parents' prior history. On May 21, 2021, the police responded to the home because mother pushed the father in front of one of the children. Father informed the police that mother had been in a mental health facility in the past, and she was refusing to take her prescribed psychiatric medications.

3

Mother was observed to be delusional and irrational. Father pressed charges and was granted an emergency protective order, and mother was arrested. On May 25, 2021, father filed a request for a domestic violence restraining order to protect himself and N.D. and L.D. against mother. On June 15, 2021, father appeared in court and was granted the restraining order. Mother was ordered to move out of father's home and stay at least 100 yards away from the protected persons. The restraining order was good for three years, until June 2024.

The social worker further reported that, on June 29, 2022, a referral was received with concerns of mother having a psychotic episode, as she was punching herself in the face in front of the children. She was placed on a psychiatric hold. On August 4, 2022, an out of custody hearing was held, and the court detained N.D. and L.D. from mother and ordered them to remain in father's care. During the dependency case, mother did not present herself to DPSS. Therefore, on May 2, 2023, the dependency case terminated and father was granted sole physical and legal custody.

The court held the initial hearing in the instant case on September 29, 2023. The court found father to be the presumed father of the child, based on the information provided.[2] The court found a prima facie showing was made that the child came within section 300 and detained him as to mother, but ordered that he remain in father's care. The court ordered that father make the child available and accessible to DPSS, and it set a jurisdiction/disposition hearing. It noted there was a restraining order in place and

_____

[2] Father stated he did a paternity test, and he was the child's biological father.

4

understood that father let mother live in the back house because he did not want her on the streets. However, the court warned father that he needed to comply with the restraining order or else it could detain the child and the older children from him.

*Jurisdiction/Disposition*

On October 20, 2023, the social worker filed a jurisdiction/disposition report, recommending that the court sustain the petition, declare the child a dependent, order reunification services for mother and family maintenance services for father, order father to complete the Safe Care parenting education program, and order a restraining order to prevent mother from entering father's home and having contact with the child, with the exception of visits approved by DPSS.

The social worker reported that, on October 18, 2023, the maternal grandmother (MGM) stated mother was diagnosed with schizophrenia at 19 years old, and prior to that, the family had observed mental health issues. Mother was observed talking to herself in the shower and hearing voices in her head. The MGM confirmed mother's history of being hospitalized and stated that mother refused to take her medications. The MGM also said father knew from day one about mother's schizophrenia and added, "The fact that he keeps getting her pregnant and they keep having kids, it's just a bad situation."

The social worker further reported that she asked father if he would be willing to participate in parenting education. He agreed, as long as there was no commitment. He said he did not want to be forced since he had participated in services such as therapy,

5

parenting classes, and drug testing for about two years before, and "nothing really []" changed."

The social worker reminded father not to allow mother in his home and that she could only have supervised contact with the child, arranged through DPSS. Father said mother came by every day to drop off breast milk, but he did not allow her in the house. He then said he wanted a restraining order against mother to prevent her from coming into the house because sometimes he would tell her to leave and she would come back 10 minutes later. He added that sometimes when he was gone, he would return, and she was in the house.

On August 10, 2023, the social worker made an unannounced visit, and mother, father, and the child were in father's home, while N.D. and L.D. were in the yard playing. The child was sleeping, and mother was cleaning up toys in the living room. The social worker spoke with the parents about the restraining order and mental health concerns. Father said he wanted to speak with someone about the family law case to make amendments to the restraining order. He said he wanted it to be a no-negative contact order.

On September 5, 2023, another social worker made an unannounced visit to father's home and observed mother in the living room holding the child, while L.D. and N.D. were sitting at the kitchen table. Father said he had not updated the restraining order and had no plans to do so unless the court ordered him to.

The social worker made another unannounced visit on September 25, 2023. Mother and the child were there, while father was at the beach with the older children.

6

On September 29, 2023, the social worker spoke with mother on the phone. Mother said everyone was telling her to take medication, but she did not want to and that nothing was wrong with her.

On October 17, 2023, the social worker made another unannounced visit and asked father for mother's contact information. He said he did not know where she lived[3], but she dropped by every day. The social worker provided him with business cards to give to mother and asked him to have mother contact her. The social worker reminded him that mother was not allowed to come inside, and he agreed.

On October 18, 2023, the social worker went to father's home, and he said mother had dropped by that morning, but he had lost the business cards the social worker gave him. The following day, the social worker called father and advised him to call Vista Community Clinic to set up a physical for the child and to ask for help enrolling in MediCal.

The social worker reported that she had concerns for the child's safety due to mother's history of mental illness. Further, mother had not engaged in services and was not taking the medications needed to stabilize her mental health. The social worker also had safety concerns with father's home, which was messy and cluttered. She had observed the child sleeping on the floor. The social worker stated that father was in need of childcare, housing, parenting education, and support, and referrals had been submitted on his behalf.

---

[3] Mother apparently moved out of the back house, at some point.

On November 21, 2023, the social worker went to father's home. She asked if mother had been around, and father said he had not seen her in two weeks. The social worker reminded him that the court ordered him to appear at the next hearing, and he said he did not want to be involved in the case. She expressed the importance of him being involved. The social worker asked if he had contacted Vista Community Clinic to schedule a check-up for the child, and father asked why it was necessary for the child to be seen by a doctor. The social worker explained the importance of regular check-ups, and he said he would take the child to a doctor if something was wrong.

The court held a contested jurisdiction hearing on November 30, 2023. The court sustained the petition and ordered psychological evaluations for both father and mother.

On January 10, 2024, the court held a disposition hearing and declared the child a dependent. It ordered father to participate in family maintenance services under specified conditions, including that he ensures the child had regular medical checkups, and that the restraining order preventing mother from having contact with the child and entering father's home remain in place. Since mother's whereabouts were unknown, the court removed physical custody of the child from her and denied her reunification services under section 361.5, subdivision (b)(1).

*Family Maintenance Status Review*

The social worker filed a family maintenance status review report on June 27, 2024, recommending that father's services be continued and the restraining order continue, with the exception of supervised visits approved by DPSS. The social worker reported that mother had not contacted DPSS in response to attempts to reach her.

8

However, on May 17, 2024, the social worker visited father's home and saw the children playing in the yard. She observed a woman sitting in a chair and asked what her name was, but the woman did not respond. The social worker asked if she was mother, and the woman again did not respond. The woman then said she was Tammy (the woman who rented the back house); however, the social worker knew she was not Tammy, since she had met Tammy before. When father opened the door, the woman ran away. The social worker reported that she advised father every time she spoke with him that he had to comply with the restraining order and protect the child from mother. However, he would always respond with, "She just shows up, what am I to do?" Thus, the social worker was concerned that father was allowing mother access to the child and allowing her in the home.

The social worker reported that father completed a psychological evaluation on January 25, 2024 and was diagnosed with "attention deficit hyperactivity disorder and [u]nspecified personality disorder turbulent type with dependent and narcissistic features." It was recommended that he have six individual psychotherapy sessions.

The social worker advised father during this reporting period to take the child to a wellness checkup, but he did not comply. She spoke with him on June 25, 2024, and verified that the child had not been seen by a doctor since he was born. The social worker warned father that he was in violation of the court's order and encouraged him to take the child to the doctor by the next hearing. Father was dismissive and said, "He looks fine to me."

The social worker reported that father started the Safe Care program on March 11, 2024; however, he was reluctant to participate in services since he had completed services during the prior dependency. On April 17, 2024, the Safe Care aid reported that he went to father's home and observed that the older children were playing in front, outside of the gate, unsupervised. Father appeared to be asleep on the couch, and the house was a complete mess. The home visits were increased from once a week to twice a week.

In an addendum report filed on August 14, 2024, the social worker reported that father completed the Safe Care program; however, the provider believed he needed further parenting education. The social worker was still concerned with father's failure to have regular checkups for the child and his failure to recognize the danger mother posed to the children.

The court held a review hearing on August 19, 2024, and the child's counsel noted her concern that mother was frequenting the home, as one of the older children made a statement that mother was in the garage. Minor's counsel said she sent an investigator to the home, and he observed that the child was sleeping on a beanbag, rather than in a crib. The court shared the same concerns and noted father was having trouble implementing what he had learned in his parenting program. The court stated it wanted DPSS to keep a close watch, and it continued father's family maintenance services.

*Section 387 Petition*

On August 23, 2024, the social worker filed a supplemental petition for a more restrictive placement under section 387, alleging that father allowed mother continued

10

access to the home, did not obtain a proper sleeping arrangement for the child, and neglected the child's hygiene. The social worker also filed a probable cause statement with regard to the children, alleging concerns with father's ability to adequately parent the child and demonstrate protective capacity. She was concerned because father still refused to take the child to any wellness checkups. The social worker further noted that, on August 20, 2024, an unannounced visit was conducted and the house was a mess, with small items that posed a choking hazard on the floor, as well as mattresses lying on the floor with dirty bedding. Father said he was recently asked to buy a crib but did not think it was necessary since the child slept on the large mattress with him. He also denied that mother had been in the home. However, while talking to father, the social worker noticed that N.D. went into the backyard and eventually came back. She asked where he went, and he said he went to see "Mommy." Father insisted that no one was in the backyard. The social worker asked N.D. where "Mommy" was, and he led her to the garage. Father said, "No, not the garage." The social worker went into the garage and saw a tent made from a bed sheet. She lifted the sheet and saw a disheveled woman squatting there. The social worker said hello several times, but the woman just sat there frozen. The social worker confronted father, and he said mother had mental health issues and said he just keeps the children away from her. When the social worker asked N.D. where he slept, he pointed to the mattress, and when asked where Mommy slept, he pointed to the loveseat next to the mattress. Father said that was not true. The social worker opined there was no reasonable means to protect the children without removing them from the parents' care.

11

On the same day, the social worker additionally filed a section 300 petition, with regard to N.D. and L.D., who were five years old and three years old, respectively, at the time. The petition alleged they came within the provisions of subdivisions (b) (failure to protect) and (j) (abuse of sibling). An amended section 300 petition was subsequently filed with substantially the same allegations, with a few amendments.

The court held a detention hearing on August 26, 2024 and found a prima facie showing was made that the children came within sections 300 and 387, and it detained them in foster care.

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on September 13, 2024, recommending that the court sustain the petitions and declare N.D. and L.D. dependents, and that the child remain a dependent. The social worker further recommended that father be offered reunification services, but that mother be denied services. The social worker met with the parents on September 5, 2024, and mother was disheveled and lacked personal hygiene. Mother confirmed that she was pregnant again, but did not confirm that father was the biological father. Father did not deny the child was his. Father was resistant to talking to the social worker and when asked who the children's primary care physician was, he said "me." He did not understand why everyone was so worried about him taking the children to see a doctor.

The court held a hearing on September 17, 2024, and set the matter contested, pursuant to mother's counsel's request. The clerk informed the court that the domestic

12

violence restraining order expired in June 2024. The court ordered mother and father to undergo psychological evaluations, as requested by DPSS.

In an addendum report filed on October 17, 2024, the social worker reported that mother completed a psychological examination, and the psychologist noted that she exhibited "unusual and bizarre behaviors" and could not answer simple questions. The psychologist believed she was "being manipulated and utilized," noting that she had been mentally ill for many years and "she gets pregnant over and over again from an individual who clearly is taking advantage of her." He stated that mother endangered her children due to her mental illness and recommended that her parents file a conservatorship to take control of her life so she would not end up pregnant again.

The social worker reported that mother subsequently underwent a second psychological evaluation, and this psychologist stated it appeared that the father of mother's children was "sexually abusive due to the fact that [mother] is impaired to the point where she cannot make decisions with consent due to her extreme mental illness" and said she "is gravely disabled with bizarre behavior and thought processes."

The social worker also reported that, on September 19, 2024, she made an unannounced visit to father's home, and mother was seated on the couch. Upon the social worker's arrival, father told mother to leave immediately. Father stated that mother was not pregnant, to which mother replied that she was still pregnant.

The court held a contested jurisdiction hearing on October 22, 2024. It sustained the petitions and declared L.D. and N.D. dependents and removed them and the child from the parents' custody. The court denied reunification services for mother and stated

13

it would be detrimental for her to have visitation with the children, but it ordered services for father. Father's case plan required him to undergo a psychological evaluation and comply with all recommendations, have an evaluation to determine if psychotropic medication was necessary, and participate in individual therapy.

*Six-Month Status Review*

The social worker filed a status review report on April 7, 2025, recommending that father's services be continued, as he was participating in parenting education and individual therapy and had completed a psychological evaluation. The psychologist opined that father had a personality disorder that precluded him from following DPSS's rules to retain custody of the children. He continued to blame the system for him losing custody, which was a sign of his mental health issues, and he did not fully acknowledge that mother was a deeply disturbed, mentally ill person. The psychologist noted that father continued to have an intimate relationship with her even though it was clear she was incapable of caring for the children, and this reflected poorly on his judgment; further, their relationship was "grossly unhealthy in many ways," and they were about to have four children from the relationship. The psychologist recommended that father continue with psychotherapy and noted that he refused to be evaluated for psychotropic medication.

The court held a hearing on April 22, 2025, and the court stated its concerns that father was not benefiting from his services. It added that he barely met the threshold for continuing services, but it followed the recommendations and continued his services.

*Twelve-month Status Review and Detention of M.D.*

On September 29, 2025, the social worker filed a status review report, recommending the court find that father failed to regularly participate and make substantive progress in his case plan, there was no reasonable probability the children would be returned if given another six months of services, and that return of the children would create a substantial risk of detriment to their safety and well-being. The social worker further recommended the court find that the children formed a sibling group, in that the child was under the age of three at the time of removal, and also that the court terminate father's services and set a section 366.26 hearing. She reported that father completed a parenting education class with Parentz@Work, as well as the Nurturing Father's Program However, he stated he did not feel like he learned anything new. Father also participated in individual therapy and showed some understanding of the impact of mother's mental health condition on the children; however, he still believed she did not pose any danger to them.

The social worker reported that mother was now residing with the MGM. The MGM reported she believed mother was still seeing father, as she observed on her Ring camera that mother would leave her house every day at 9:00 a.m. and return at 1:00 p.m. When the social worker asked father if he had seen or spoken with mother, he said, "No comment."

The social worker stated that it would be detrimental to return the children to father's custody, as he had not successfully addressed the objectives of his case plan or demonstrated that he benefitted from his services. Father had not accepted responsibility

15

for the reason the children were removed from his care and continued to minimize his behavior. The social worker was also concerned with his ongoing contact with mother. Father showed resistance to change and stated that therapy was a waste of time and that he was a nurturing parent. However, the social worker noted that, while in his care, the children did not receive necessary medical or educational attention, and he declined to take them to professionals that could have addressed apparent developmental delays in the child and the other children's behavioral issues.

On October 3, 2025, the social worker filed a section 300 petition on behalf of newborn child, M.D., who was born on September 29, 2025. The petition alleged that he came within the provisions of subdivisions (b) (failure to protect), (g) (no provision for support), and (j) (abuse of sibling). The petition specifically alleged that father had a DPSS history with similar allegations and failed to benefit from previous services offered.

The social worker filed a detention report, recommending that the court detain M.D. The social worker reported that DPSS received a referral when M.D. was born. The social worker noted that mother was on a psychiatric hold in the mental health unit before giving birth, as she had verbalized wanting to harm the baby while pregnant. Mother identified father as M.D.'s father. An amended petition was subsequently filed, deleting the allegation under section 300, subdivision (g). The social worker contacted father, and he said he wanted a paternity test done.

On October 6, 2025, the court held a detention hearing regarding M.D., detained him in foster care, and authorized paternity testing. It then set a jurisdiction hearing for

November 4, 2025. Paternity testing later determined that father was M.D.'s biological father.

On October 9, 2025, the court held a 12-month status review hearing with regard to the children, and father's counsel set the matter for contest. The court set the hearing for November 4, 2025. Both hearings were continued until December 16, 2025.

In an addendum report filed on October 29, 2025, the social worker reported that DPSS learned on September 30, 2025, that father recently went to Wisconsin, where the children were now living with the paternal grandparents. He had been given permission to visit the children but was advised that he needed notify DPSS prior to going; however, he failed to do so. On October 28, 2025, father stated that he should have the children, and his plan was to go to Wisconsin at some point and bring them back to California. He continued to deny responsibility and blamed the current circumstances on mother for coming to his home.

On October 30, 2025, the social worker filed a jurisdiction/disposition report as to M.D., recommending that the court sustain the petition, declare him a dependent, deny reunification services to mother pursuant to section 361.5, subdivision (b)(2), deny services to father pursuant to section 361.5, subdivisions (a) and (b)(10), and set a section 366.26 hearing. The social worker stated DPSS was concerned because in the previous cases, father was unwilling to acknowledge the risk mother presented and how her mental health issues placed the children at serious risk of harm. Despite ongoing case management and services, including the Safe Care program, father continued to place the

17

children at risk of harm by allowing mother unsupervised access to the children. Additionally, father failed to meet the children's basic needs.

The court held a combined hearing on December 16, 2025, with regard to all the children. With respect to the 12-month status review, the court adopted DPSS's recommendations, noting that father recently indicated he did not need services and that everything DPSS asked him to do was just common sense. The court found that he failed to participate regularly and make substantive progress in his case plan and that return of the children would create a substantial risk of detriment to their safety and well-being. It therefore terminated father's reunification services as to the children and set a section 366.26 hearing. As to the jurisdiction/disposition hearing regarding M.D., the court sustained the petition, adjudged him a dependent, and removed him from the parents' custody. The court denied mother services under section 361.5, subdivision (b)(2), and denied father services under section 361.5, subdivision (b)(10), as they would not be in M.D.'s best interests. It then set this matter for a section 366.26 hearing for the same date as the children's case.

## DISCUSSION

I. The Court Properly Terminated Father's Reunification Services as to the Children

Father argues the court erred in terminating his reunification services as to the children because DPSS failed to produce sufficient evidence that he failed to make substantive progress in his case plan. He points out that he participated in therapy, parenting education, and a psychological evaluation, as required, and he maintained stable housing and employment. We conclude the court properly terminated his services.

18

A. *Relevant Law*

Section 361.5, subdivision (a), sets forth various time limitations on reunification services depending on the child's age. "For children over the age of three on the date of initial removal, the presumptive period of services is 12 months, with an 18-month maximum. [Citation.] For children under the age of three at the time of initial removal, 'services shall be provided for a period of 6 months from the dispositional hearing, . . ., but no longer than 12 months from the date the child entered foster care.' [Citation.] And where, as here, a "sibling group"—two or more children related as full or half siblings—is removed from their parents' custody, and one of the siblings is under three years of age on the date of initial removal, . . . the presumptive period of reunification services for applicable sibling groups is six months from the date of the dispositional hearing per section 361.5, subdivision (a)(1)(B)." (*B.D. v. Superior Court* (2025) 110 Cal.App.5th 1132, 1150-1151 (*B.D.*); § 361.5, subd. (a)(1)(B), (C).)[4]

At a 12-month review hearing, "the court shall order the return of the child to the physical custody of their parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).)

---

[4] While the presumptive maximum period of services for children over the age of three and under the age of three is 18 months and 12 months, respectively, the actual maximum period is 24 months. (§ 361.5, subds. (a)(3), (a)(4).)

19

At the 12-month review hearing for a dependent child under three years old at time of removal, a juvenile court that does not return a child to the parent's custody must either schedule a hearing under section 366.26 (§ 366.21, subd. (g)(4)), order that the child remain in foster care (§ 366.21, subd. (g)(5)), or extend services for an additional six months until an 18-month review hearing (§ 366.21, subd. (g)(1)-(3)).  In order to extend the case for an additional six months to an 18-month review hearing, where the parent has received reasonable services the court must find "a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home within the extended period of time," which in turn requires findings that a parent has (1) "consistently and regularly contacted and visited with the child," (2) "made significant progress in resolving problems that led to the child's removal from the home," and (3) "demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs."  (§ 366.21, subd. (g)(1)-(3).)

B. *The Record Does Not Compel a Finding That There Was a Substantial Probability of Return of the Children to His Custody Within Six Months*

At the outset, we note the children were removed from father at the contested jurisdiction hearing on October 22, 2024.  The child was under the age of three at that time, and the court found them to be a sibling group at the 12-month hearing on December 16, 2025.  Thus, father had already received the presumptive maximum number of 12 months of reunification services allowed.  (§ 361.5, subd. (a)(1)(B), (C); *B.D.*, *supra*, 110 Cal.App.5th at p. 1151.)

20

In any event, father argues the court erred in terminating his services since there was insufficient evidence to support its finding that he failed to make substantive progress in his case plan. He is essentially claiming the court should have continued his services for an additional six months, since he made reasonable efforts to address the problems that led to removal of the children.

The court here actually found that father failed to make substantive progress in his case plan, as he asserts. However, the court was not required to make this finding in order to terminate his services and set a selection and implementation hearing pursuant to section 366.26. To continue the case for an additional six months and thus extend services rather than setting a selection and implementation hearing, the court was required to find "a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home within the extended period of time." (§ 366.21, subd. (g).) The court here found there was no substantial probability that the children would be returned if given an additional six months of services. Thereafter, the court set a selection and implementation hearing.

To the extent father is arguing the court should have found there was a substantial probability of return in six months, this argument is unavailing. "[T]he question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re Raul V.* (2022) 82 Cal.App.5th 290, 300-301.) To prevail on this challenge, father must show that the evidence compelled the finding as a matter of law, that is, that the evidence "'was (1) "uncontradicted and unimpeached" and

21

(2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Id*. at p. 301.)

Father essentially asserts there was no evidence he maintained contact with mother in the months leading up to the termination of services, he participated in therapy, parenting programs, and a psychological evaluation, as required by DPSS, and he "largely completed his case plan, [and] maintained [] stable housing and employment." He claims these facts "lend credence to the notion that six additional months of services would have resulted in" the return of his children.

We disagree. While father did complete some of his services, the evidence showed that he failed to benefit from them. He completed three parenting education programs, participated in individual counseling, and completed a psychological evaluation. However, he stated therapy was a "waste of time" and insisted he was a nurturing parent. Further, when the children were in his care, father failed to meet their basic needs, including medical care, a safe place to sleep, adequate supervision, and a home free of debris and choking hazards. Remarkably, father could not even see the need for regular medical check-ups for the child. He still did not understand why DPSS had to be involved with his family.

Moreover, father's psychological evaluation indicated that he was in deep denial and would likely not follow through in keeping mother away from the children. He continued to blame the system for him losing custody, which the psychologist said was a sign of his mental health issues. Mother had "extreme mental illness" and was "gravely disabled with bizarre behavior and thought processes," yet father did not fully

22

acknowledge that she was severely mentally ill. The psychologist noted that father continued to have an intimate relationship with her even though it was clear she was incapable of caring for the children, and this reflected poorly on father's judgment. Further, father was unwilling to acknowledge the serious risk mother posed to the children, and he placed them at risk of harm by allowing her unsupervised access to them.

In view of the record, we conclude the evidence does not compel a finding that there was a substantial probability of return to father's care. The court properly declined to extend the case for an additional six months and continue his services.

## II. The Court Properly Denied Father Reunification Services as to M.D.

Father argues the court erred in denying him services under section 361.5, subdivision (b)(10), as to M.D. He points out that the 12-month review hearing during which the court terminated his services as to the children was calendared in conjunction with the jurisdiction/disposition hearing for M.D. He then contends the consecutive rulings "did not take into account the efforts he previously made to rectify the problems that led to [the children's] removal and did not provide further opportunity, *prior to bypass*, for [him] to made additional efforts to demonstrate his protective capacity as to M.D." Father also asserts the court did not make any explicit findings that he failed to make a subsequent reasonable effort to treat the problems that led to the removal of the children.

At the outset, we note that father failed to raise these issues in the juvenile court. Therefore, the issues are waived. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338

23

["a parent's failure to object or raise certain issues in the juvenile court prevents the parent from presenting the issue to the appellate court"].)  In any event, we conclude the court properly denied father services.

A.  *Relevant Law*

Section 361.5, subdivision (b) "sets forth a number of circumstances in which reunification services may be bypassed altogether.  These bypass provisions represent the Legislature's recognition that it may be fruitless to provide reunification services under certain circumstances."  (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 597.)  Specifically, "reunification services need not be provided to a parent or guardian . . . when the court finds, by clear and convincing evidence, any of the following:  [P] . . . [P] (10) (A) That the court ordered termination of reunification services for any siblings . . . of the child because the parent or guardian failed to reunify with the sibling . . . after the sibling . . . had been removed from that parent or guardian . . . and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling . . . of that child from that parent or guardian."  (§ 361.5, subd. (b)(10)(A).)

B.  *The Evidence Was Sufficient*

In *In re Harmony B.* (2005) 125 Cal.App.4th 831 (*Harmony B.*), the juvenile court held a six-month review hearing with respect to the mother and father's older children, at which the court terminated reunification services.  The court conducted the jurisdictional/dispositional hearing for their younger child immediately thereafter.  It sustained the petition, declared her a dependent, and removed her from her parents'

24

custody. The court denied reunification services to her parents based on the order terminating reunification services as to the older siblings. (*Id.* at p. 836.)

Similar to the instant case, the father in *Harmony B.*, argued on appeal that the court abused its discretion in denying him services, based on the fact that it denied services on the same day it terminated services as to the siblings. (*Harmony B.*, *supra*, 125 Cal.App.4th at pp. 839-840.) This court found that "when some time has elapsed after the termination of reunification services with respect to one child, the court appropriately must take into account the parent's reasonable efforts to correct the underlying problems in the interim before the court denies reunification services with respect to a second child. When, however, . . . the two proceedings occur in immediate proximity, the trial court['s] required finding under the 'no-reasonable effort' clause is a formality because the parent's circumstances necessarily will not have changed. (*Id.* at pp. 842-843.)

In explaining this difference in treatment, this court explained, "[i]n our view, the statute was amended to provide a parent who has worked toward correcting his or her problems an opportunity to have that fact taken into consideration in subsequent proceedings; it was not amended to create further delay so as to allow a parent, who up to that point has failed to address his or her problems, another opportunity to do so." (*Harmony B., supra,* 125 Cal.App.4th at p. 843.)

In other words, in the instant case, it was not error for the court to deny father's services under section 361.5, subdivision (b)(10) immediately after terminating his services in the children's case. (*Harmony B.*, *supra*, 125 Cal.App.4th at pp. 842-843.)

25

Moreover, father is correct that the court made no express finding that he failed to make reasonable efforts to treat the problems that led to removal of the children. We conclude, however, that such finding can properly be implied on the record before us, since the implicit finding is supported by substantial evidence. (*In re S.G.* (2003) 112 Cal.App.4th 1254, 1260 ["we will infer a necessary finding provided the implicit finding is supported by substantial evidence"]; see *In re Corienna G.* (1989) 213 Cal.App.3d 73, 83.) The juvenile court could easily conclude that father had not made a reasonable effort to treat the problems that led to the children's removal and that it was not in M.D.'s best interests to provide him with reunification services. (See § I, *ante*.)

DISPOSITION

The writ petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____<br>J.

We concur:

McKINSTER _____
         Acting P. J.
MENETREZ _____
         J.